1

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)

2
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024

3
Telephone: (310) 405-7190
jpafiti@pomlaw.com

4

5
*Attorney for Plaintiff*

6
*[Additional Counsel on Signature Page]*

7

8
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9

10
JEFFREY KAIN, Individually and on Behalf of
All Others Similarly Situated,

11

12
                                    Plaintiff,

13
            v.

14
ACM RESEARCH, INC., DAVID HUI
WANG, LISA FENG, and MARK A.

15
MCKECHNIE,

16

17
                                    Defendants.

18

19

20

21

22

23

24

25

26

27

28

Case No: 3:20-cv-09241-VC

**CLASS ACTION**

AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Honorable Vince Chhabria

DEMAND FOR JURY TRIAL

---

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Jeffrey Kain ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts and other information prepared for investors by ACM Research, Inc. ("ACM", "ACMR", or the "Company"), as well as media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      During the Class Period and beyond, ACM faced a cash crunch even though it claimed to have nearly $90 million in the bank. ACM is borrowing at high rates of interest, and the Company is pushing for an IPO of its Shanghai subsidiary in order to raise cash.

2.      At the same time, ACM is dependent upon access to the U.S. for critically-needed parts and investment capital.  In the U.S., ACM currently trades on the NASDAQ.

3.      In its web of self-dealing and presence before two international stock exchanges, ACM misled the very U.S. shareholders who it plans will fund the operations of ACM's Shanghai subsidiary, with little if any upside, once the subsidiary IPO goes through.

4.      Given that, by ACM's own admission, the success of its subsidiary IPO is of existential importance to the Company, Defendants were, at all relevant times, motivated to present a positive image of the Company to American investors.

5.      Thus far, Defendants were only prevented from deceiving their own shareholders due to the dogged efforts of a third-party stock analyst.

6.    In this federal securities class action on behalf of all those who purchased or otherwise acquired ACM securities between March 6, 2019 and November 16, 2020, inclusive (the "Class Period"), Plaintiff seeks to pursue remedies against ACM and certain of the Company's current and former senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

7.    ACM, together with its subsidiaries, develops, manufactures, and sells single-wafer wet cleaning equipment for enhancing the manufacturing process and yield for integrated chips worldwide. The Company markets and sells its products under the "Ultra C" brand name through direct sales force and third-party representatives.

8.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's revenue and profits had been diverted to undisclosed related parties; (ii) accordingly, the Company had materially overstated its revenues and profits; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

9.    On October 8, 2020, stock-research analyst J Capital Research ("J Capital") published a report concerning ACM, in which J Capital concluded that ACM "***is a fraud, over-reporting both revenue and profit***." (Emphasis added.) The report cited, among other things, J Capital's visits to sites in China, Korea, and California and more than 40 interviews.

10.    The J Capital report raised several concerns regarding ACMR's operations and financials including 1) over-reporting revenues and margins, 2) capital equipment required to build tools, 3) overstated inventory costs, 4) understated warranty and service costs, 5) ACM's cash position, and 6) undisclosed individuals diverting revenue and profit from the Company.

11.    More specifically, the J Capital report stated that –

- ACMR reports industry-leading gross margins of 47%, which are significantly higher than the margins of other wafer cleaning tool firms.

- ACMR's revenue could be overstated by 15-20%.

- ACMR is building tools but has virtually no capital equipment. The value of office equipment added since the start of 2019 greatly exceeds the value of added manufacturing equipment.

- undisclosed related parties are diverting revenue and profit from the Company.  This includes ACMR suppliers making sales for the Company and customers allowed to collect commissions *on sales to themselves*.

- 45% of total inventory has not been paid for and are sitting on customer premises.

- ACMR tunnels over-reported profit out of the company which may be through about $20 million in overstated inventory costs and through cash that is inflated or just compromised.

- At least $11 million in warranty and service expenses are understated.

- ACMR appears to be strapped for cash in-spite of the $86 million reported on the balance sheet. ACMR had $25.77 million in short-term borrowings in Q2 2020, up by $21.88 million quarter-over-quarter. ACMR's CEO has personally guaranteed 11 of 13 short-term "lines of credit" issued on the Chinese mainland.

- Cash is missing in the Shanghai subsidiary IPO company accounts vs the U.S. GAAP accounts.

- Inventory levels appeared unusually high.

12.     After the Company failed in its attempt to rebut the J Capital report, ACM's stock price fell $1.09 per share, or 1.52%, to close at $70.79 per share on October 8, 2020.

13.     Next, on November 17, 2020, following the release of quarterly results, J Capital published an update to their October 8 report. The update disclosed, among other things, that –

- ACM's assumption of debt was inconsistent with its stated cash position.

- ACMR's financials were rife with unexplained discrepancies related to interest earned on cash balances, a well-known red flag.

- ACMR's reliance on 15 lines of credit did not comport with its alleged possession of unencumbered assets in Mainland China, where its debt obligations were also located.

- American investors will be unable to access any profits that could come from ACMR's Shanghai subsidiary, where 98% of the Company's business takes place.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

- Finished, but unpaid for, equipment is counted as counted as finished goods inventory.

- 12.5% of equipment delivered since 2009 has not been paid for.

14.    In response to the November 17 update, ACM's share price fell by $4.03 per share, or 5%, to close at $77.79 per share on November 17, 2020.

15.    As a result of Defendants' wrongful acts and omissions, and the decline in the price of ACM common shares detailed herein, Plaintiff and other members of the Class (as defined below) have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.    Jurisdiction is conferred by Section 27 of the Exchange Act.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.  Defendant ACM maintains its corporate headquarters in this District.

18.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19.    Plaintiff, as set forth in his previously-filed Certification (Dkt. No. 23-5), which is incorporated by reference herein, purchased or otherwise acquired ACM securities during the Class Period and has been damaged thereby.

20.     Defendant ACM is a Delaware corporation that was founded in 1998 and headquartered in Fremont, California.  The Company, together with its subsidiaries, develops, manufactures, and sells single-wafer wet cleaning equipment for enhancing the manufacturing process and yield for integrated chips worldwide.  ACM's securities trade on the Nasdaq Global Select market ("NASDAQ") under the ticker symbol "ACMR."

21.     Defendant David Hui Wang ("Wang") has served as ACM's Chairman, Chief Executive Officer, and President at all relevant times.

22.     Defendant Lisa Feng ("Feng") served as ACM's Interim Chief Financial Officer from prior to the start of the Class Period until November 2019.

23.     Defendant Mark A. McKechnie ("McKechnie") has served as ACM's Chief Financial Officer since November 2019.

24.     The Individual Defendants possessed the power and authority to control the contents of ACM's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of ACM's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with ACM, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.     ACM and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     ACM, a semiconductor manufacturer, was founded in 1998 in Silicon Valley, and

initially developed tools for wafer processing steps involving the integration of copper and ultralow dielectric materials.

27.    ACM, together with its subsidiaries, develops, manufactures, and sells single-wafer wet cleaning equipment for enhancing the manufacturing process and yield for integrated chips worldwide. The Company markets and sells its products through direct sales force and third-party representatives.

28.    Though ACM is an American company, and had its U.S. initial public offering ("IPO") in 2017, the Company's sole US operations – "ACM Research (CA)" – during the Class Period consisted of 5 employees, occupying a 3,000 square foot office and warehouse space in Fremont, California. The function of this entity is to provide procurement services on behalf of ACM's Shanghai subsidiary:

## Corporate Structure



Note 1: ACM Sold all shares in CleanChip to ACM Shanghai for $3.5m in Dec. '2019
Note 2: It would appear that ACM Korea was *formed* as a subsidiary of ACM but is currently a subsidiary of CleanChip

Endpoint of blue arrows shows wholly owned subsidiary of entity at the beginning of the arrow
e.g. ACM Research (CA) is a wholly owned subsidiaries of CleanChip Technologies.

29.    Substantially all of the Company's product development, manufacturing, support and services are in Mainland China. Twenty-eight of the company's 361 full-time employees are located in Korea, and the rest are in China and Taiwan. All the company's sales in 2018, 2019, and 2020 were made to customers outside the United States.

30.    The Company currently has only one demo tool in the U.S. - a megasonic technology-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

based wafer wet cleaning tool (SAPS II) at an undisclosed U.S. R&D lab.

31.     ACM's heavy reliance on the Asia-Pacific region for growth is underscored by just three customers in China accounting for 73.8% of the company's revenue in 2019. Two customers based in China (PRC) accounted for 54% of the revenue, Korea-based SK Hynix accounted for 19.8%.

32.     ACM expanded its operations into Asia in 2006 and formed the subsidiary, ACM Research (Shanghai), Inc. ("ACM Shanghai").

33.     As discussed and documented in the J Capital report and update, ACM Shanghai was a significant locus of the Company's fraudulent activities.  For example, in the ACM Shanghai IPO documents, the subsidiary is revealed to have had ***negative operating cash flow for 2019,*** even though the Chinese Mainland accounts for a whopping ***96% of ACM's total main operating income***. (Emphasis added).

34.     In June 2011, the Company formed a second subsidiary, ACM Research (Wuxi), Inc.

35.     In addition, ACM purports to have a presence at various locations outside China, including Taiwan, Korea, and the U.S., because even though ACM manufactures its equipment in China, but it apparently needs parts from the U.S. During ACM's the quarterly earnings call held in August 2020, Defendant McKechnie stated as follows:

> Again, as you know, a lot of our supply chain, we're fortunate is in Asia. China is certainly back to business as we speak. ***There are some components that we have to get in Japan or even some in the U.S. that we have seen some lead times stretch out.*** But we're managing it closely, and we feel we've got that mitigated. [Emphasis added.]

36.     In May 2020 ACM Shanghai submitted its application for an initial public offering (IPO) of its shares on the Shanghai Stock Exchange STAR Market. If successful, the Company will be the first US-traded company to list a China-based subsidiary on the STAR market.

37.     On September 30, 2020, ACM reported that the application for the STAR IPO was approved by the Listing Committee of the STAR Market.

38.     On October 1, 2020, just before the truth about the Company began to emerge, ACM

1  announced the approval of the proposed listing of shares of ACM Shanghai.

2      39.    In the wake of the scrutiny brought to bear on ACM following the publication of the J

3  Capital report and update, the planned STAR IPO has stalled.  Only recently, the Company warned

4  investors that

5  
6      If we are unable to complete the STAR Listing and the STAR IPO, we may not
       otherwise be able to realize the advantages to our PRC operations contemplated by our
7      business strategy, ***including improving our ability to market our products, building our
       brand in the PRC markets, assisting our sales efforts to new customers and
8      encouraging additional purchases of our tools by existing customers***. (Emphasis
       added).

9  
10              **Materially False and Misleading Statements Issued During the Class Period[1]**

11     40.    The Class Period begins on March 6, 2019, when ACM issued a press release

12 announcing the Company's fourth quarter and fiscal year 2018 results.  The press release stated, in

13 relevant part:

14     ACM's President and Chief Executive Officer Dr. David Wang commented, "Our strong
       financial performance in 2018 was a result of robust customer demand and crisp
15     execution.  We delivered 104% revenue growth, expanded operating margins, and
       generated $6.9 million in cash flow from operations.  In addition ***to strong financial
16     results***, we made significant operating progress in 2018.  We ramped production at our
       second factory, delivered a significant number of first tools, and introduced our newest
17     major platform, the Ultra-C Tahoe."

18 
19     Dr. Wang continued, "As we head into 2019, we continue to see solid business
       momentum.  We are committed to achieving our vision of becoming a major player in the
20     semiconductor equipment market, and we look forward to delivering another strong year
       in 2019."

21 
22                                     ***

23     • **Revenue**. Revenue for 2018 was $74.6 million, up 104% from 2017, due
         primarily to an increase in revenue from single-wafer wet cleaning tools.
24       Revenue for the fourth quarter of 2018 was $20.8 million, up 21% from the fourth
         quarter of 2017, due to an increased volume of tools shipped for revenue, and
25       higher prices associated with these tools.

26 
27                                     ***

28 
---
[1] Emphasis added throughout, unless otherwise noted.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**Outlook**

For fiscal year 2019, the Company expects revenue to be approximately $100 million.

41.    On March 7, 2019, ACM hosted an earnings call with investors and analysts to discuss the Company's fourth quarter 2018 results (the "Q4 2018 Earnings Call").  During the scripted portion of the Q4 2018 Earnings Call, Defendant Wang touted, in relevant part:

> In the fourth quarter, ***we delivered strong revenue, profitability and cash flow from operations***. For the full year, we grew revenue by 104% to $74.6 million, driven by robust customer demand for our tools and crisp executions. Our product differentiation, improved production scale and expanded operating leverage drove non-GAAP gross margin of 46.2% and non-GAAP operating margin of 13.2%. We generate $6.9 million in cash flow from operations and ended the year with more than $27 million of cash. Total shipments, which including two deliveries but not yet fully recognized as revenue were $95 million, up 137% from $40 million in 2017.
>
> ***
>
> We are excited by our business prospects and remain committed to gain the share with new products, new customers and more production steps. ***For 2019, we expect revenue of $100 million, up 34%, reflecting strong demand from our existing customers***.

42.    In addition, during the scripted portion of the call, Defendant Feng stated, in relevant part:

> ***Revenue was 74.6 million, up 104%.*** Total shipments were 95 million versus 40 million in 2017. ***Gross margin was 46.2 % compared to 47.2% in 2017***. Non-GAAP operating margin was at 13.2% versus 6.4% a year ago. Non-GAAP net income was 9.9 million compared to the net income of 1.3 million in 2017. Other income in 2018 was positive 1.3 million versus a loss of 0.8 million in 2017. The income in 2018 was due to our 5.7% decline in Chinese renminbi versus the dollar during the year.
>
> For the fourth quarter, revenue was 20.8 million, up 21%. ***Growth was driven by solid demand for our single-wafer cleaning equipment***. Total shipments were approximately 32 million compared to 13 million last year. And the 32 million last quarter total shipments, including tools shipped and recognized as revenue in the quarter plus shipments pending customer acceptance.

43.    The statements referenced in ¶¶40-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made

9

false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (iv) The Company's expected revenue was contradicted by internally-known, present facts; (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

44.     Responding to an analyst's query on the March 7 call, Defendant Wang stated it was ACM's "general policy" to recognize revenue "anywhere between six months to one year" following shipments to customers.

45.     On March 14, 2019, ACM filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"). In providing an overview of the business, the 2018 10-K stated, in relevant part:

> We focus our selling efforts on establishing a referenceable base of leading foundry, logic and memory chip makers, whose use of our products can influence decisions by other manufacturers. We believe this customer base will help us penetrate the mature chip manufacturing markets and build credibility with additional industry leaders. ***Using a "demo-to-sales" process, we have placed evaluation equipment, or "first tools," with a number of selected customers. Since 2009 we have delivered more than 55 single-wafer wet cleaning tools, more than 50 of which have been accepted by customers and thereby generated revenue to us and the balance of which are awaiting customer acceptance should contractual conditions be met***.

46.     The statements referenced in ¶¶44-45 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (ii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (iii) as a result,

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

the Company's public statements were materially false and misleading at all relevant times.

47.     Further, in describing the Company's customers and its sales and marketing, the 2018 10-K stated, in relevant part:

> **We generate most of our revenue from a limited number of customers as the result of our strategy of initially placing single-wafer wet cleaning equipment with a small number of leading chip manufacturers that are driving technology trends and key capability implementation.** In 2018, 85.7% of our revenue was derived from three customers: Yangtze Memory Technologies Co., Ltd., a leading PRC memory chip company, together with one of its subsidiaries, accounted for 38.8% of our revenue; Shanghai Huali Microelectronics Corporation, a leading PRC foundry, accounted for 23.6% of our revenue; and SK Hynix Inc., a leading Korean memory chip company, accounted for 23.3% of our revenue. In 2017, 55.2% of our revenue was derived from four customers: SK Hynix Inc. accounted for 18.1% of our revenue; Shanghai Integrated Circuit Research and Development Center Ltd., a public research consortia for the Chinese semiconductor industry, accounted for 14.1% of our revenue; JiangYin ChangDian Advanced Packaging Co. Ltd., a leading PRC foundry, accounted for 12.8% of our revenue; and Yangtze Memory Technologies Co., Ltd., together with one of its subsidiaries, accounted for 10.2% of our revenue.

48.     The statements referenced in ¶47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

49.     Next, in comparing the Company's revenue, cost of revenue, and gross margin for the year ended December 31, 2018 and 2017, the 2018 10-K stated, in relevant part:

> **Revenue for the year ended December 31, 2018 compared to the year ended December 31, 2017 increased by $38.1 million. The increase was due to a $41.4 million increase**

11

*in revenue from single-wafer wet cleaning tools to our front-end customers, offset in part by a $3.2 million decline in revenue of tools to our back-end customers*. Our revenue for 2018 compared to 2017 reflected significant growth for three of our large front-end customers, partly offset by a decline at one front-end and one back-end customer.

\*\*\*

*Cost of revenue increased $20.9 million, and gross profit increased $17.2 million, for the year ended December 31, 2018 compared to 2017*, reflecting the growth in sales.

50.     The statements referenced in ¶50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

51.     In addition, with respect to the Company's controls and procedures, the 2018 10-K stated, in relevant part:

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Accounting Officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, or the Exchange Act, as of December 31, 2018. The evaluation included certain internal control areas in which we have made and are continuing to make changes to improve and enhance controls. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

*Based on that evaluation, our Chief Executive Officer and Chief Accounting Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure.*

***Management's Report on Internal Control Over Financial Reporting***

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. ***Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with general accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent*** or detect misstatements. ***Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.***

Our management, with the participation of our Chief Executive Officer and Chief Accounting Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this assessment, our management used the criteria set forth in the Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2018***.

52.    The statements referenced in ¶51 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective;

13

and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

53.    On May 7, 2019, ACM issued a press release announcing the Company's first quarter 2019 results.  The press release stated, in relevant part:

> ACM's President and Chief Executive Officer Dr. David Wang commented, "Business momentum continued, and we executed well relative to our expectations.  ***We delivered solid revenue growth and profitability***, and we introduced two new electrochemical plating products.  ***First quarter results demonstrate the competitive strength of our technical expertise, product differentiation and production scale.*** All of our products, from SAPS, TEBO and Tahoe to our new Ultra ECP products, incorporate our innovative and differentiated technologies, which we have committed to continuously develop to exceed the expectations of our customers."
>
> ***
>
> • Revenue ***increased 110% to $20.5 million, due to an increased volume of tools shipped for revenue and higher prices associated with these tools.*** Revenue for the first quarter included repeat shipments, and several customer acceptances of tools shipped in previous quarters.
>
> ***
>
> **Outlook**
>
> For fiscal year 2019, ***the Company continues to expect revenue to be approximately $100 million***.

54.    The statements referenced in ¶52 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) The Company's expected revenue was contradicted by internally-known, present facts; (vi) the foregoing, once revealed, would foreseeably subject the Company to significant financial

14

and/or reputational harm; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

55.    That same day, ACM hosted an earnings call with investors and analysts to discuss the Company's first quarter 2019 results (the "Q1 2019 Earnings Call"). During the scripted portion of the Q1 2019 Earnings Call, Defendant Wang stated, in relevant part:

> ***We delivered a solid revenue growth, excellent profitability***, and we introduce key new electrical plating or ECP products. First-quarter results demonstrate the competitive strength of our technical expertise. Product differentiation and the production scale. Revenue would double from the same period last year, solid operating leverage grew gross margin of a 43.1% and operating margin of 14.6%. We ended the quarter with more than $27 million of cash.
>
> \*\*\*
>
> We are excited by our business prospects and remain committed to gaining share with new products, new customers, and a more production steps. ***We are maintaining our guidance for the full year for 2019. We'll continue to expect a revenue of highly million up 34% which reflects the strong demand from our existing customers***. Importantly, visibility for the full-year improved due to a solid orders and a customer forecast during Q1.
>
> To conclude, our solid results show that we are executing our strategy, we are participating in the growth of our major new [indiscernible]. We are ramping production at our new factory, and we continue to deliver innovative and new products. We remain committed to achieving our vision of become a major player in a semiconductor equipment market. We look forward to continuing to deliver strong results in the balance of this year and beyond.

Further, also during the scripted portion of the Q1 2019 Earnings Call, Defendant Fang stated, in relevant part, "[r]evenue was $20.5 million, up 110%. ***Growth was driven by solid demand for our single wafer cleaning equipment and our back end tool***. And we had a customer acceptances at a first the tools that had shipped in prior periods."

56.    In addition, when asked a question regarding improved visibility, Defendant Wang responded, in relevant part, "[b]ut based on our forecast and also our tool has been shipped last year which is some of them we recognized revenue this year. ***So where we are fully confident about a $100 million revenue in 2019***."

57.    The statements referenced in ¶¶55-56 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) The Company's expected revenue was contradicted by internally-known, present facts; (vi) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

58.    On May 14, 2019, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting he Company's financial and operating results for the quarter ended March 31, 2019 (the "Q1 2019 10-Q").  The Q1 2019 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*.  Further, in comparing the Company's revenue, cost of revenue, and gross margin for the three months ended March 31, 2019 and 2018, the Q1 2019 10-Q stated, in relevant part:

> ***The increase in revenue of $10.7 million*** in the three months ended March 31, 2019 as compared to the same period in 2018 reflected increases in revenue of $3.3 million from single-wafer cleaning equipment, and ***a $7.4 million increase in revenue from back-end equipment and spares. The revenue increase reflected an increased number of tools shipped, coupled with higher selling prices associated with the equipment sold and customer acceptances from prior period shipments received and recognized as revenue during the three month ended March 31, 2019***.
>
> ***
>
> Cost of revenue increased $7.0 million and ***gross profit increased $3.7 million in the three months ended March 31, 2019***, as compared to the corresponding period in 2018, primarily due to increased sales volume.

59.     The statements referenced in ¶58 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

60.     Finally, with respect to controls and procedures, the Q1 2019 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and interim chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2019. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of March 31, 2019, our chief executive officer and interim chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective***.

61.     Appended to the Q1 2019 10-Q as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wang and Feng, attesting that, "the information

17

contained in the [Q1 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of ACM Research, Inc. for the period presented therein."

62.    The statements referenced in ¶61 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

63.    On June 6, 2019, Defendant Wang spoke at the Company's annual shareholder meeting and said, in pertinent part:

> ***Our growth is driven by share gains in the $3 billion market for single-wafer wet-cleaning tools***. We have gained share with new customers, new product and the penetration of additional production steps. We also believe our opportunity for growth will increase as industry moves forward to more advanced nodes and 3-dimensional architectures.

> Our 2018 results demonstrates excellent progress towards our strategic objectives. ***For 2018, we grew revenue by 104% to $74.6 million driven by a robust customer demand for our tools and the quick speed execution. Our product differentiation, improved product scale -- production scale and expanded operating leverage drove a non-GAAP gross margin of 46.2% and a non-GAAP operating margin of 13.2%. We generated $6.9 million in cash flow from operations and ended the year with more than $27 million in cash. Total shipments, which include tools delivered but not yet fully recognized as revenue, were $95 million, up 137% from $40 million in 2017.***

64.    The statements referenced in ¶63 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made

18

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) the Company was cash-strapped, as evidenced by its reliance on multiple credit lines; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

65.    On August 7, 2019, ACM issued a press release announcing the Company's second quarter 2019 results.  The press release stated, in relevant part:

> ACM's President and Chief Executive Officer Dr. David Wang commented, "*We are pleased with our second quarter results, and the momentum we have been building throughout 2019. Despite the industry cycle, we executed well in the June quarter, achieving strong top- and bottom-line growth*.  As we look ahead to the remainder of 2019, we are excited by our business opportunities.  We have strong demand, our visibility remains solid, and the team is executing to plan."

***

> • **Revenue** *increased 39.0% to $29.0 million, due to an increased volume of tools shipped for revenue and higher prices associated with these tools*.  Revenue for the second quarter included repeat shipments and several customer acceptances of tools shipped in previous quarters.

***

> **Outlook**
>
> The Company *has increased its full year 2019 revenue guidance to $105 million, an increase of $5 million from the Company's previous 2019 revenue guidance*.

66.    The statements referenced in ¶65 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to

19

undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

67.     On August 8, 2019, ACM hosted an earnings call with investors and analysts to discuss the Company's second quarter 2019 results (the "Q2 2019 Earnings Call").  During the scripted portion of the Q2 2019 Earnings Call," Defendant Wang stated, in relevant part:

> ***Revenue grew to $29 million up 39% from last year, a strong top-line good growth margin and disciplined spending resulted in high-teens operating margin for the quarter***. Total shipments rebounded to $33 million up more than 50%. ***We ended the quarter with $27.6 million of cash.***
>
> \*\*\*
>
> We remain committed to balancing our near-term profitability with investment to drive longer-term growth.
>
> \*\*\*
>
> For 2019, we're raising our revenue outlook to US$105 million, representing more than 40% annual growth. This is an increase of $5 million from the guidance we provided on last quarter's call. ***Our outlook reflects strong demand from our existing customers. We have a good visibility for the remains of the year, due to solid order and forecasts provided by our key customers***.
>
> . . . our strong results show that we are exciting our strategy -- executing our strategy; we are participating in the growth of the major new IC fabs; we are ramping production at our new factory; and we continue to deliver innovative new products. We remain committed to achieving our vision of become a major player in the semiconductor equipment market.

Further, also during the scripted portion of the Q2 2019 Earnings Call, Defendant Feng stated, in relevant part, "***Revenue was $29 million, up 39%. Growth was driven by solid demand for our single-wafer cleaning equipment and our back-end tools***."

68.     The statements referenced in ¶67 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

69.    On August 12, 2019, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "Q2 2019 10-Q").  The Q2 2019 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*.  Further, in comparing the Company's revenue, cost of revenue, and gross margin for the three months ended June 30, 2019 and 2018, the Q2 2019 10-Q stated, in relevant part:

> ***The increase in revenue of $8.1 million in the three months ended June 30, 2019*** as compared to the same period in 2018 reflected ***increases in revenue of $9.7 million from single-wafer cleaning equipment.*** . ***The revenue increase reflected an increased number of tools shipped, coupled with higher selling prices associated with the equipment sold and customer acceptances from prior period shipments received and recognized as revenue during the three month ended June 30, 2019.***

***

> Cost of revenue increased $3.7 million and ***gross profit increased $4.4 million*** in the three months ended June 30, 2019, as compared to the corresponding period in 2018, primarily due to increased sales volume.

70.    The statements referenced in ¶69 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production

21

costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

71.    Finally, with respect to controls and procedures, the Q2 2019 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and interim chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2019. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of June 30, 2019, our chief executive officer and interim chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.***

72.    Appended as an exhibit to the Q2 2019 10-Q was substantively the same SOX certification as referenced in ¶61, *supra*, signed by Defendants Wang and Feng.

73.    The statements referenced in ¶¶71-72 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production

costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

74.    On November 6, 2019, ACM issued a press release announcing the Company's third quarter 2019 results.  The press release stated, in relevant part:

> ACM's President and Chief Executive Officer Dr. David Wang commented, "We delivered record revenue and shipments, demonstrating our ability to scale production to major customers. We had several important deliveries in the quarter, including a "first tool" to our newest customer, an emerging China-based DRAM manufacturer, and several ECP AP tools to a major packaging customer. ***With a successful U.S. capital raise, we now have $47 million in cash, which puts us in a good position to support our growth plans***."

***

> - **Revenue *increased 44.2% to $33.4 million***, due to an increased volume of tools shipped for revenue and higher prices associated with these tools.  Revenue for the quarter was entirely driven by repeat shipments, with no acceptances contributing to revenue for the period.

***

> **Outlook**
>
> ***For fiscal year 2019, the Company continues to expect revenue to be approximately $105 million.***

75.    The statements referenced in ¶74 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has

23

not been paid for; (v) The Company's expected revenue was contradicted by internally-known, present facts; (vi) The Company, as evidenced by its reliance on numerous credit lines, was cash-strapped; (vii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (viii) as a result, the Company's public statements were materially false and misleading at all relevant times.

76.    On November 7, 2019, ACM hosted an earnings call with investors and analysts to discuss the Company's third quarter 2019 results (the "Q3 2019 Earnings Call"). During the scripted portion of the Q3 2019 Earnings Call, Defendant Wang stated, in relevant part:

> ***Our third quarter results mark another quarter of great financial results, new product development, and strategic progress. We delivered record revenue, record shipments, strong bottom line growth and we're strengthening our balance sheet.*** This result validated our technology, our spending product portfolio, and our ability to scale production. We remain focused on our mission to become a major proprietor of technical equipment to the semiconductor industry. ***Revenue growth of $33 million, up 44%,*** our customers push us to deliver high volume tools in the third quarter as they scale their own production capacity, with some key delivers accelerated from the fourth quarters.
>
> ***

> ***For 2019, we continue to expect our revenue to be approximately $105 million***. ***This represents more than 40% annual growth. We are proud of this growth***, given a challenging year for the industry. As we look to 2020, we plan for growth. We plan to provide formal guidance for the full year 2020 on our next earnings call.

77.    Further, also during the scripted portion of the Q3 2019 Earnings Call, Defendant Feng stated, in relevant part, "***[r]evenue was $33.4 million, up 44%. Growth was driven by solid demand for our single-wafer cleaning equipment and our new ECP copper plating tools for advanced packaging***." Finally, when asked a question regarding revenue growth in 2020, Defendant Wang responded, in relevant part, ". . . ***we recognize revenue as we expect that fast***. So come to the point is definitely, as I said, two product ECP will add the revenue. However, we've added more new customer. So maybe the most bigger revenue come to the year 2021, but we still say next year a quarter shipment, contribute like a shipment."

78.     The statements referenced in ¶¶76-77 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for, undercutting Defendant Wang's claim of "fast" revenue recognition; (vi) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

79.     On November 13, 2019, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting he Company's financial and operating results for the quarter ended September 30, 2019 (the "Q3 2019 10-Q").  The Q3 2019 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*.  Further, in comparing the Company's revenue, cost of revenue, and gross margin for the three months ended September 30, 2019 and 2018, the Q3 2019 10-Q stated, in relevant part:

> ***The increase in revenue of $10.3 million in the three months ended September 30, 2019*** as compared to the same period in ***2018 reflected increases in revenue of $5.7 million*** from single-wafer cleaning equipment, and increases in revenue of $4.6 million from back-end wafer assembly and packaging equipment. ***The increase in revenue was driven by a higher number of tools shipped for revenue, offset by a decrease in customer acceptances from prior period shipments received and recognized as revenue during the three months ended September 30, 2019***.
>
> ***
>
> ***Cost of revenue increased $4.3 million and gross profit increased 6.0 million in the three months ended September 30, 2019***, as compared to the corresponding period in 2018, due to increased sales volume and higher gross margin.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

80.    Finally, with respect to controls and procedures, the Q3 2019 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and interim chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2019. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission, or the SEC. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of September 30, 2019, our chief executive officer and interim chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.***

81.    Appended as an exhibit to the Q3 2019 10-Q was substantively the same SOX certification as referenced in ¶61, *supra*, signed by Defendants Wang and McKechnie.

82.    The statements referenced in ¶¶80-81 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective;

and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

83.    On March 18, 2020, ACM issued a press release announcing the Company's fourth quarter and fiscal year 2019 results.  The press release stated, in relevant part:

> ACM's President and Chief Executive Officer Dr. David Wang commented, "2019 was a remarkable year for ACM Research as we expanded our customer base, launched new products, and ramped production capacity at our second factory. ***We delivered 44% revenue growth, expanded operating margins, and generated more than $9 million in cash flow from operations. We grew our cash balance to $58 million at year-end, with an additional $60 million of proceeds held in restricted cash from the private equity funding into our ACM Shanghai subsidiary***."

***

> **Outlook**
>
> *For fiscal year 2020, the Company expects revenue to be in the range of $130 million to $150 million*, unchanged from its January 13, 2020 announcement.

***

> **Revenue**. ***Revenue for 2019 was $107.5 million***, up 44% from 2018, due primarily to an increase in revenue from single-wafer wet cleaning tools. ***Revenue for the fourth quarter of 2019 was $24.6 million***, up 18% from the fourth quarter of 2018, due to an increased volume of tools shipped for revenue and higher prices associated with those tools.

84.    The statements referenced in ¶¶83 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

85.    On March 19, 2020, ACM hosted an earnings call with investors and analysts to discuss the Company's fourth quarter 2019 results (the "Q4 2019 Earnings Call").  During the scripted portion of the Q4 Earnings Call, Defendant Wang stated, in relevant part, "[o]ur full year 2020 outlook is unchanged. *We expect revenue to be in the range of $130 million to $150 million as we announced on January 13. This represents 30% annual growth at the midpoint*[,]" and "[a]s [indiscernible] we are committed to our [indiscernible] balance between current profits and investment growth. *We believe that growing fast with the profitability will deliver the maximum value to our shareholders*." Further, also during the scripted portion of the call, Defendant McKechnie stated, in relevant part, "*Q4 was another strong quarter ending 2019 at a high note with good profitability[,]*" and "*[r]evenue was $107.5, up 44*%."

86.    The statements referenced in ¶85 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) The Company's expected revenue was contradicted by internally-known, present facts; (vi) Defendants' growth plans will not deliver maximum benefits to U.S. investors, who will not be able to access any profits that could come from the Shanghai subsidiary, where 98% of ACMR's business takes place (vii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (viii) as a result, the Company's public statements were materially false and misleading at all relevant times.

87.     On March 24, 2020, ACM filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K").   The 2019 10-K contained a substantively similar overview of the Company, its customers, and its sales and marketing as referenced in ¶45, *supra*.  Further, with in comparing the Company's revenue, cost of revenue, and gross margin for the year ended December 31, 2019 and 2018, the 2019 10-K stated, in relevant part, "*[r]evenue for 2019* compared to 2018 *increased by $32.9 million*. *The increase was due to a $22.4 million increase in revenue from single-wafer wet cleaning tools to our front-end customers, and an $10.5 million increase in revenue of tools to our back-end customers*[,]" and "[c]ost of revenue increased $16.7 million, and *gross profit increased $16.2 million*, for 2019 compared to 2018, reflecting the growth in sales."

88.     The statements referenced in ¶87 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

89.     In addition, with respect to disclosure controls and procedures, the 2019 10-K stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our company's disclosure controls and

procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, or the Exchange Act, as of December 31, 2019. The evaluation included certain internal control areas in which we have made and are continuing to make changes to improve and enhance controls. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs. The effectiveness of the disclosure controls and procedures is also necessarily limited by the staff and other resources available to management and the geographic diversity of our company's operations.

***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2019, our company's disclosure controls and procedures were effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure***.

### *Management's Report on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with general accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of our company;
- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of our company are being made only in accordance with authorizations of management and directors of our company; and
- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our company's assets that could have a material effect on the financial statements.

***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2019. In making this assessment, our management used the

criteria set forth in the Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2019***.

90.    Appended as an exhibit to the 2019 10-K was substantively the same SOX certification as referenced in ¶61, *supra*, signed by Defendants Wang and McKechnie.

91.    The statements referenced in ¶¶89-90 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

92.    On May 6, 2020, ACM issued a press release announcing the Company's first quarter 2020 results.  The press release stated, in relevant part:

**Outlook**

For fiscal year 2020, the Company continues to expect revenue to be in the range of $130 million to $150 million.

*** 

- **Revenue** was ***$24.3 million, up 18.9%,*** reflecting an increase in revenue from single wafer wet cleaning and other front-end processing equipment, offset in part by a decrease in revenue from back-end wafer assembly and packaging equipment.

93.    The statements referenced in ¶92 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts

31

about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

94.    On May 7, 2020, ACM hosted an earnings call with investors and analysts to discuss the Company's first quarter 2020 results (the "Q1 2020 Earnings Call").  During the scripted portion of the Q1 2020 Earnings Call, Defendant Wang stated, in relevant part, "[w]e delivered double-digit revenue growth, even though some shipments delayed from Q1 into Q2," and "[w]e expect revenue to be in the range of $130 million to $150 million. This will represent 30% annual growth at the mid-point." Further, also during the scripted portion of the Q1 2020 Earnings Call, Defendant McKechnie stated, in relevant part, "[f]or the first quarter, revenue was $24.3 million, up 19%. Q1 revenue and shipments were impacted by the COVID-19 related shutdowns. Revenue growth was driven by an increase in front-end equipment, partly offset by a decrease in back end assembly and packaging equipment."

95.    The statements referenced in ¶94 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

96.    On May 8, 2020, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "Q1 2020 10-Q"). The Q1 2020 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*. Further, in comparing the Company's revenue, cost of revenue, and gross margin for the three months ended March 31, 2020 and 2019, the Q1 2020 10-Q stated, in relevant part:

> ***The increase in revenue of $3.8 million*** in the three months ended March 31, 2020 as compared to the same period in 2019 reflected increases in revenue of $10.0 million from front-end single-wafer cleaning equipment, offset in part by a decrease in revenue of $6.1 million from back-end wafer assembly and packaging equipment.
>
> ***
>
> Cost of revenue increased $2.5 million and ***gross profit increased $1.4 million*** in the three months ended March 31, 2020, as compared to the corresponding period in 2019, due to increased sales volume and lower gross margin.

97.    The statements referenced in ¶96 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

98.    Finally, with respect to controls and procedures, the Q1 2020 10-Q stated, in relevant part:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2020. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission, or the SEC. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of March 31, 2020, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.

99.     Appended as an exhibit to the Q1 2020 10-Q was substantively the same SOX certification as referenced in ¶61, *supra*, signed by Defendants Wang and McKechnie.

100.    The statements referenced in ¶¶98-99 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

101.    On August 5, 2020, ACM issued a press release announcing the Company's second quarter 2020 results.  The press release stated, in relevant part:

**<u>Outlook</u>**

For fiscal year 2020, the Company now expects revenue to be in the range of $140 million to $155 million, up from the previous guidance range of $130 million to $150 million.

\*\*\*

- **Revenue *was $39.0 million, up 34.6%,*** reflecting an increase in revenue from single wafer wet cleaning and other front-end processing equipment, and an increase in revenue from back-end wafer assembly and packaging equipment.

102.    The statements referenced in ¶101 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

103.    On August 6, 2020, ACM hosted an earnings call with investors and analysts to discuss the Company's second quarter 2020 results (the "Q2 2020 Earnings Call").  During the scripted portion of the Q2 2020 Earnings Call, Defendant Wang stated, in relevant part:

*We delivered revenue of $39 million, up 35% year-over-*year. Revenue in the quarter was evenly split between our 3D NAND customer and our 2 foundry customers. Shipments were $45 million, up 36% year-over-year and a strong rebound from the pause in Q1. *We delivered good balance of growing versus profitability, with almost a 50% gross margin and 21% operating margin*. We remain committed to delivering profitable growth as we continue to invest in R&D for new products and global sales and marketing.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

\*\*\*

Accordingly, we have updated our full year 2020 outlook. ***We expect revenue to be between $140 million and $155 million, upper from the previous range of $130 million*** to $150 million. The revised revenue range represents 37% annual growth at mid-point.

104.    Further, also during the scripted portion of the Q2 2020 Earnings Call, Defendant McKechnie stated, in relevant part, "[f]or the second quarter, revenue was $39 million, up 35%. Growth was driven by solid demand for our front-end equipment and back-end tools. As David noted, we had a balanced revenue contribution from our 3D NAND customer and our 2 logic customers."  In addition, when asked a question regarding research and development trending for 2020, Defendant McKechnie responded, in relevant part:

> . . . I think we always started the year, we have a discipline internally to balance our near-term profitability with investments in the longer-term opportunities. ***And so when we saw our revenue moving -- got confidence, and we saw some additional upside to take our range up***. We started investing in some additional new products. So R&D for the year, we see it kind of staying at about that level, about the $5 million or so per quarter. If we see some additional revenue, we might increase that to bring some new products to market faster.

105.    The statements referenced in ¶¶103-104 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) the Company's expected revenue was contradicted by internally-known, present facts; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

106.    On August 10, 2020, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 20, 2020 (the "Q2 2020 10-Q").  The Q2 2020 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*.  Further, in comparing the Company's revenue, cost of revenue, and gross margin for the three months ended June 30, 2020 and 2019, the Q2 2020 10-Q stated, in relevant part:

> *The increase in revenue of $10.0 million in the three months ended June 30,* 2020 as compared to the same period in 2019 consisted of *an increase in revenue of $8.9 million* from single-wafer cleaning and other front-end processing equipment and an increase in revenue of $1.1 million from back-end wafer assembly and packaging equipment and spares.

> ***

> Cost of revenue increased $3.8 million and gross profit increased $6.2 million in the three months ended June 30, 2020 as compared to the corresponding period in 2019 due to the increased sales volume noted above and a 4.3% increase in gross margin, which reflected differences in product mix and increased production scale.

107.    The statements referenced in ¶106 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

108.    Finally, with respect to controls and procedures, the Q2 2020 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2020. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the SEC. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of June 30, 2020, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.

109.    Appended as an exhibit to the Q2 2020 10-Q was substantively the same SOX certification as referenced in ¶61, *supra*, signed by Defendants Wang and McKechnie.

110.    The statements referenced in ¶¶108-109 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

111.    On August 13, 2020, ACM presented at the Needham Virtual SemiCap and EDA Conference, where Defendant Wang stated as follows:

The company was founded in U.S. 1998 and 2005 made a joint venture in the China and 2017 we got there our IPO in NASDAQ. ***And also last year we're starting a planning our subsidiary in Shanghai go to the Star Market in China***. So our goal probably keeping both lists ACM headquarter or mother company in NASDAQ and also our subsidiary industry in China.

***Our goal is really more of expanding penetrate the local China market as same time with not in a structure also maintain good sales and marketing and on the force to penetrate the market outside China***. ***So our goal we believe eventually our half revenue come from China and half revenue come from outside of China market.*** And I think that's our strategy.

112.    The statements referenced in ¶111 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) The STAR company and ACMR US have adopted rules to keep ACMR US from "making use of the issuer's funds"; (ii) U.S. investors will not be able to access any profits that could come from the Shanghai subsidiary, where 98% of ACMR's business takes place; (iii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

113.    On October 8, 2020, analyst J Capital published a report (the "report") concerning ACM entitled "Dirty Business," in which J Capital concluded that ACM "is a fraud, over-reporting both revenue and profit." J Capital asserted that "[w]hat real profit the company has is apparently being siphoned off to related parties."

114.    J Capital co-founder and research director Anne Stevenson-Yang does has spent the bulk of her professional life in China since first arriving in 1985, working as a journalist, magazine publisher, and software executive, with stints in between heading up the U.S. Information Technology office and the China operations of the U.S.-China Business Council.

39

115.    Over the years, J Capital has exposed numerous frauds including Luckin Coffee and Fanhua, Inc.

116.    The J Capital report was based on (i) their in-person visits to ACMR sites in China, Korea, and California; (ii) credit reports on ACMR subsidiaries accessed by J Capital; (iii) J Capital's review of ACMR's exchanges with Shanghai regulators; and (iv) more than 40 interviews conducted by J Capital.

117.    The report concluded, in relevant part:

- ACMR reports industry-beating gross margins of 47%. We believe the real gross margins are half that at best. That would wipe out the company's net profit.

- We estimate that revenue is overstated by 15-20%.

- We have evidence that undisclosed related parties are diverting revenue and profit from the company

- Key means by which ACMR tunnels over-reported profit out of the company may be through about $20 mln in overstated inventory costs and through cash that is inflated or just compromised. We think least $11 mln in warranty and service costs are understated.

- ACMR appears to be strapped for cash in spite of the $86 mln reported on the balance sheet. ACMR had $25.77 mln in shortterm borrowings in Q2 2020, up by $21.88 mln QoQ and at average annualized borrowing cost of 6.1% compared with annualized interest income of 1.3%. ACMR's CEO has personally guaranteed 11 of 13 short-term "lines of credit" issued on the mainland.

118.    With respect to inventory, the report said:

There is a large mismatch between what clients have told us and what ACMR reports. ***ACMR claims nearly $20 mln in inventory of delivered machines—meaning completed machines that have not been paid for and are sitting on customer premises. This is an astonishing 45% of total inventory***…. There is no room for inventory of completed goods. We believe that the $19.6 mln in finished-goods inventory reported by the company is an invention.

119.    In addition, the report questioned the Company's research and development operations. For example, the report quoted a former longtime R&D employee of ACM, who stated, "I felt there

was no technological content in their product. [. . .] They don't have much in way of R&D, a lab, manufacturing. It's an assembly operation."

120.    Finally, the report discussed certain related party transactions, explaining, in relevant part:

We think ACMR management is using five on-paper-only companies to divert money. In September, we learned more about this process. ***We obtained ACMR's responses to questions from Chinese regulators about its IPO application, and in those documents, ACMR discloses that almost all its sales run through "agents."***

\*\*\*

We have gotten detailed pricing and invoicing information from six of ACMR's top clients. Five of them had paid more for equipment than ACMR disclosed. We think that extra payment was diverted, possibly to management via an "agent" or possibly back to the SOE customer."

121.    Indeed, the report cited specific related parties whose relationships had not been disclosed to U.S. investors.  For example, the J Capital report stated, in relevant part:

Lida is responsible for 41% of ACMR 2019 sales and is owned by an undisclosed related party. The ¥15.26 mln commission that ACMR reported paying to Lida in 2019 represented 45% of Lida's income.10 These facts are disclosed to the Chinese regulator in response to questions about the draft registration document. But the English-language 8K fails to mention these things.

Lida owner Wang Beiyi is also a supplier to ACMR, owner of an agency selling on behalf of ACMR, and a shareholder of both the Chinese IPO vehicle and U.S.-traded company. ACMR owns 15% the company that Wang uses to sell "filters etc." to ACMR. ACMR makes the ridiculous claim that Wang's company, Shengyi Semiconductor Technology (Wuxi) Co., Ltd., sells them filters—a commodity product that is super abundant in China—for 62% less than competitors.

122.    Similarly, states the J Capital report, "[i]n its registration statement [for ACM Shanghai], ACMR reported one set of payments to "customers" and another to "final customers." Yangtze Memory and Huahong were both customers and end customers, *i.e.*, were collecting hefty commissions on selling to themselves:

### Sales to top [f]ive customers (2018)

| SN | Name | Amount | Proportion |
|----|------|--------|-----------|
| | **2018** | | |
| 1 | Huahong Group | 12,667.23 | 23.02% |
| 2 | Yangtze Memory | 12,653.88 | 23.00% |
| 3 | Hynix | 12,117.32 | 22.02% |
| 4 | Qianjing International | 6,935.04 | 12.60% |
| 5 | ACMR | 6,081.94 | 11.05% |
| | **Total** | **50,455.41** | **91.69%** |

Sales to top 5 final customers (2018)

| SN | Name | Amount | Proportion |
|----|------|--------|------------|
| | 2018 | | |
| 1 | Yangtze Memory | 18,735.81 | 34.05% |
| 2 | Huahong Group | 15,314.19 | 27.83% |
| 3 | Hynix | 12,117.32 | 22.02% |
| 4 | JCET | 2,536.22 | 4.61% |
| 5 | SMIC | 2,188.16 | 3.98% |
| | Total | 50,891.71 | 92.49% |

Source: 8K pages 135-136

123.    ACM's diverted and/or disappeared revenue was highlighted in the J Capital report demonstrating the gap between the Company's STAR IPO account and U.S. GAAP account:

### Table 5. Current Assets US GAAP vs Chinese IPO Accounts

| US GAAP accounts (,000 US dollars) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Cash and cash equivalents | $58,261 | $27,124 | $17,681 |
| Restricted cash* | $59,598 | – | |
| Other current assets | $0 | $0 | $46 |
| Total cash and equivalents | $117,859 | $96,028 | $62,914 |
| STAR IPO Accounts (,000 USD equivalent) | | | |
| Cash and bank balances | $62,861 | $13,690 | $6,450 |
| Other current assets | $27,510 | $531 | $141 |
| Total cash and equivalents | $90,371 | $81,119 | $41,380 |
| Difference | -$27,488 | -$14,909 | -$21,534 |

124.    Critically, the J Capital report was supported by links to original documents, including Chinese language documents, that supported its allegations, *see* https://www.jcapitalresearch.com/acmr.html, as well as photos and videos of site visits to ACM-related facilities, *see* https://www.jcapitalresearch.com/acmr-site-visits.html

125.    At midday on October 8, 2020, ACM issued a press release claiming that "[t]he [J Capital] report contains numerous misstatements of historical facts regarding ACM's business and operations, including, among others, errors regarding revenue, tool ASPs, gross margins, key suppliers, inventory, and other balance sheet-related items." However, unlike J Capital, the Company did not offer

any evidentiary support for its claims. Those details, ACM promised, would be revealed during the Company's upcoming earnings call set for November 2020.

126.    ACM's threadbare denials failed to dispel investors' well-founded pessimism, and the Company's stock price fell $1.09 per share, or 1.52%, to close at $70.79 per share on October 8, 2020.

127.    Despite the October 8, 2020 price drop, ACM did not substantively respond to the J Capital report during its Q3 2020 earnings call, held on November 6, 2020. Instead, Defendant Wang repeated the Company's previous, boilerplate denials and told analysts that ACM would refute the J Capital revelations in a "comprehensive report" to be released publicly.

128.    On November 5, 2020, ACM issued a press release announcing the Company's third quarter 2020 results.  The press release stated, in relevant part:

> ACM's President and Chief Executive Officer Dr. David Wang commented, "***We delivered strong third quarter results with 43% growth in revenue*** and 37% growth in shipments from the third quarter of 2019. Both revenue and shipments in are new quarterly records for ACM. We built momentum for Tahoe with another repeat shipment, and for ECP with two repeat shipments and one first tool delivery in the third quarter.  We have good visibility for the remainder of 2020 and have raised our outlook accordingly."

129.    The statements referenced in ¶128 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) the Company's expected revenue was contradicted by internally-known, present facts; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

130.    On November 9, 2020, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q"). The Q3 2020 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*. Further, in comparing the Company's revenue, cost of revenue, and gross margin for the three months ended September 30, 2020 and 2019, the Q3 2020 10-Q stated, in relevant part:

> ***The increase in revenue of $28.1 million*** in the nine months ended September 30, 2020 as compared to the same period in 2019 reflected increases in revenue of $28.9 million from single-wafer cleaning and other front-end processing equipment, offset by a decrease in revenue of $0.8 million from back-end wafer assembly and packaging equipment and spares.
>
> *** ***
>
> Cost of revenue increased $16.4 million and ***gross profit increased $11.7 million*** in the nine months ended September 30, 2020, as compared to the corresponding period in 2019, due to increased sales volume and higher gross margin.

131.    The statements referenced in ¶130 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

132.    Finally, with respect to controls and procedures, the Q3 2020 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2020. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the SEC. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of September 30, 2020, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.***

133.    Appended as an exhibit to the Q3 2020 10-Q was substantively the same SOX certification as referenced in ¶61, *supra*, signed by Defendants Wang and Feng.

134.    The statements referenced in ¶¶132-133 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

135.    On November 17, 2020, J Capital issued an update (the "update") to its original report regarding ACM, explaining that,"[w]e posed a number of questions for ACM Research (ACMR) before

its Q3 results, but the quarter report just deepened the mystery." The November 17, 2020 J Capital report asked "why ACMR seems so cash-starved when the company reported a cash balance of $92.2 mln in Q3 2020 and a positive operating cash flow. Nevertheless, the company took on new debt specifically to fund short-term working capital. Q3 2020 short-term debt rose from $25.8 mln in Q2 2020 to $28.3 mln."

136.    Moreover, the November 17 update flagged the following "[u]nexplained discrepancies related to interest earned on cash balances":

- Interest income earned during Q3 2020 was just $179,000 com-pared to end-period cash balances of $92.2 [million], a dramatic fall relative to the $320,000 in interest earned in the previous quarter, when end-period cash balances were lower, at $86.4 [million].

- In Q3 2020, the company incurred an interest expense of $272,000, far higher than any interest earned.

137.    The November 17 update also shed light on the discrepancy between ACM's "15 different lines of credit, 14 from mainland China banks, of which 10 bear personal guarantees by CEO David Wang" and the fact that "[n]o debt is collateralized or guaranteed by the company's assets on Mainland China, where the principal operations are located."

138.    ACM's reliance on credit thus drew into question the allegedly "real and unencumbered" nature of the Company's assets, which it should have used against primarily Mainland Chinese debt obligations.

139.    Likewise, the update homed in on ACM's Q3 2020 admission that the Company had delivered fifteen (15) single-wafer wet cleaning and other front-end processing machines, but that these same machines *had yet to be paid for by the receiving customer(s)*. As noted in the update, these

inchoate sales existed in a sort of limbo: there were tax receipts or cash transactions for auditors to verify, because no sale had been booked.

140.    In addition, the update report discussed ACM's reliance on "gold leasing," an esoteric form of credit commonly used by miners and jewelers but not industrial companies. As explained by a Chinese banker cited in the update, "[i]f you make semiconductor cleaning equipment, the gold you secure for leasing becomes your inventory. It's really a trading security, but no one can tell it apart from other inventory. It does not show up as debt. It's purely a way to fatten the balance sheet." The gold leasing provision cast doubt on whether ACMR actually had –or could access – the $92.2 million it claimed to have in cash at the time of the update.

141.    The update confirmed the Company's addiction to related-party transactions. In particular, "ACMR gifted $18 mln to a group of related parties, including someone who is the company's largest sales agent and a major supplier. ***The Q3 2020 report includes an agreement granting 242,681 warrants at $7.50 each for shares in ACMR*** to Shengxin (Shanghai) Management Consulting Limited Partnership (SMC). ***The shares are currently trading at $82***."

142.    In another continuity from the October 8 report, the update identified fresh, material disclosures by the Company to Shanghai-based regulators in Chinese ***but not to U.S. investors in English***. Among the details that readers of Chinese, such as J Capital, learned:

- ***ACMR inflates its gross profit margin by foisting production costs off on the R&D budget***. There are several ways in which ACMR hides costs. One key manner is to charge raw materials to the R&D budget. In a document submitted to Shanghai regulators, ACMR reported that some materials for machines, which are always customized, are paid for on the R&D budget. On page 8-1-1-208 of the company's recent responses to Shanghai regulators1 entitled "Regarding R&D Expenses," ACMR reported that ¥18.7 mln in raw materials in H1 [first half of] 2020, 5.3% of revenue in the half, were charged to the R&D budget. Adding these materials to cost of goods sold in H1 would have lowered gross margin from 46.7% to 42.2%. ***If the purported R&D expenses were added to COGS*** [Cost of Goods Sold] ***for Q3 2020, as we believe they should be, gross margin would drop by 20 points***. There are other suspicious charges to R&D, such as direct labor, that inflate margin. We also suspect that ACMR may be using this R&D ruse, along with demo tools, to avoid paying VAT, thus boosting

47

profit margins further but risking penalties, a reversal of this strategy, and unwelcome regulatory scrutiny on its proposed STAR IPO listing.

- The STAR company and ACMR US have adopted rules to keep ACMR US from "making use of the issuer's funds." This provides an added layer of certainty that ***U.S. investors will not be able to access any profits that could come from the Shanghai subsidiary, where 98% of ACMR's business takes place***.

- ***12.5% of equipment delivered since 2009 has not been paid for.*** Using a "demo-to-sales" process, the Company places evaluation equipment, or "first tools," including the unpaid-for 15 machines discussed above, with numerous customers, ***and then counts that equipment as finished goods inventory***: "Finished goods inventory represents 'demo-to-sales' product which have been delivered to customers for evaluation." (Q3 2020 earnings presentation page 8) Indeed, Defendant McKechnie specified on the earnings call that the inventory uptick in Q3 2020 was for demo tools:

### Table 2. Growth of Increments in Receivables vs. Sales

| in mln USD | Q1 2020 | Q2 2020 | Q3 2020 |
|---|---|---|---|
| Sales Growth YoY | $3.85 | $10.04 | $14.24 |
| Accounts Receivable Growth YoY | $12.16 | $27.51 | $16.65 |

Source: Company disclosures

143. Following the publication of J Capital's update, ACM's stock price fell again, this time by $4.03 per share, or 5%, to close at $77.79 per share on November 17, 2020.

144. As a result of Defendants' wrongful acts and omissions, and the decline in the price of ACM securities detailed herein, Plaintiff and other Class members have suffered significant losses and damages.

145. The investor research site *Seeking Alpha* observed that the influence of the J Capital on investors was undeniable because "market participants were explicitly shorting the stock" and "the fact remains that short interest in ACMR has risen in 2020 compared to the year before."[2]

146. On December 15, 2020, ACM filed with the SEC on Form 8-K an alleged English translation of a document purportedly submitted to the Shanghai Stock Exchange. In the rambling, 116-

---

[2]    https://seekingalpha.com/article/4393551-rising-risks-for-acm-research-even-though-continues-to-grow-rapidly

page document, ACM claimed to have "conducted self-inspection on the relevant challenges" identified by the J Capital report. Instead, the Company attempted to deflect from the report's serious implications by, among other things, clarifying that "the rental fee of ACMR's office space in California is generally consistent with the local rental market price" and a naked claim that "[t]he CFO of the Company did not participate in the accounting fraud to inflate sales of Lumenis, Ltd.." *See* https://www.sec.gov/Archives/edgar/data/0001680062/000114036120028466/brhc10017901_ex99-01.htm at 8-4-1-104-105.

## ADDITIONAL SCIENTER ALLEGATIONS

147.    As alleged herein, ACM and the Individual Defendants acted with scienter in that: (i) they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ACM, their control over and/or receipt and/or modification of ACM's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning ACM, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

148.    ACM's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the

SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. § 78u-5(b)(2)(A).

149.    Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of ACM who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

150.    At all relevant times, the market for ACM securities was an efficient market for the following reasons, among others:

(a)    ACM stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    According to the Company's Form 10-K for the fiscal year ended December 31, 2019, ACM had more than 16 million shares of Class A common stock and more than 1 million shares of Class B common stock outstanding as of March 17, 2020;

(c)    as a regulated issuer, ACM filed periodic public reports with the SEC;

(d)    ACM regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)    unexpected material news about ACM was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

151.    As a result of the foregoing, the market for ACM securities promptly digested current information regarding ACM from publicly available sources and reflected such information in the price of ACM securities.    Under these circumstances, all purchasers of ACM securities during the Class Period suffered similar injury through their purchases of ACM securities at artificially inflated prices, and a presumption of reliance applies.

152.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions.    Because this action involves Defendants' failure to disclose material adverse information regarding ACM's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.    All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.    Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

153.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ACM securities and operated as a fraud or deceit on Class Period purchasers of ACM securities by misrepresenting the value of the Company's business and prospects by concealing the significant defects in its underwriting and due diligence practices and deficiencies in its commercial credit portfolio and related securitized assets.    As the Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's securities fell precipitously as the prior artificial inflation came out of the securities' price.    As a result of their purchases of ACM

51

securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

154.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired ACM securities during the Class Period (the "Class").  Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

155.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ACM securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ACM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

158.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented material facts about the business, operations and management of ACM; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

159.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<u>**COUNT I**</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

160.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

161.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of ACM securities during the Class Period.

163.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ACM securities.  Plaintiff and the Class would not have purchased ACM securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against All Defendants)

164.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

165.    Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Company stock, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury.

DATED:  May 6, 2021                                   Respectfully submitted,

                                                      **POMERANTZ LLP**

                                                      */s/ Louis C. Ludwig*
                                                      Patrick V. Dahlstrom
                                                      (*pro hac vice*)
                                                      Louis C. Ludwig
                                                      (*pro hac vice*)
                                                      10 South La Salle Street, Suite 3505
                                                      Chicago, Illinois 60603
                                                      Telephone: (312) 377-1181
                                                      Facsimile: (312) 377-1184
                                                      pdahlstrom@pomlaw.com
                                                      lcludwig@pomlaw.com

                                                      **POMERANTZ LLP**
                                                      Jennifer Pafiti (SBN 282790)
                                                      1100 Glendon Avenue, 15th Floor
                                                      Los Angeles, California 90024
                                                      Telephone: (310) 405-7190
                                                      jpafiti@pomlaw.com

                                                      **POMERANTZ LLP**
                                                      Jeremy A. Lieberman
                                                      (*pro hac vice*)
                                                      J. Alexander Hood II
                                                      (*pro hac vice*)
                                                      600 Third Avenue
                                                      New York, New York 10016
                                                      Telephone: (212) 661-1100
                                                      Facsimile: (212) 661-8665
                                                      jalieberman@pomlaw.com
                                                      ahood@pomlaw.com

                                                      ***Lead Counsel***

                                                      **BRONSTEIN, GEWIRTZ
                                                      & GROSSMAN, LLC**
                                                      Peretz Bronstein
                                                      (*pro hac vice* application forthcoming)
                                                      60 East 42nd Street, Suite 4600

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

New York, NY 10165
Telephone: (212) 697-6484
peretz@bgandg.com

***Additional Counsel for Lead Plaintiff***

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS