```
             UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF CALIFORNIA

        BEFORE THE HONORABLE VINCE CHHABRIA


JEFFREY KAIN, Individually   )
and on Behalf of Others      )
Similarly Situated,          )
                             )
        Plaintiff,           )
                             )
    vs.                      )   No. 3:20-cv-09241-VC
                             )
ACM RESEARCH, INC., et al,   )   San Francisco, California
                             )   Thursday
        Defendants.          )   September 9, 2021
_____)    2:42 p.m.
```

### TRANSCRIPT OF MOTION HEARING HELD VIA ZOOM

**TELEPHONIC APPEARANCES**:

 **For Plaintiff**:          POMERANTZ LLP
                             10 South LaSalle Street, Suite 3505
                             Chicago, IL 60603
                     **BY:   LOUIS C. LUDWIG, ESQ.**

 **For Defendants**:         FRESHFIELDS BRUCKHAUS DERINGER US,
                             LLP
                             2710 Sand Hill Road
                             Menlo Park, CA 94025
                     **BY:   BORIS FELDMAN, ESQ.**
                             **DORU GAVRIL, ESQ.**




Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46038
                         (855) 873-2223
                         www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
        transcript produced by transcription service.

**Thursday - September 9, 2021**                    **2:42 p.m.**

**P R O C E E D I N G S**

---000---

THE COURTROOM DEPUTY:  Now calling 20-cv-9241, Kain v. ACM Research, Inc., et al.  Counsel for the plaintiff, please state your appearance.

**MR. LUDWIG:**  Good afternoon, Your Honor.  Louis Ludwig from Pomerantz LLP on behalf of lead plaintiff.

**THE COURT:**  Hello.

THE COURTROOM DEPUTY:  For the defendant?

**MR. FELDMAN:**  May it please the Court, Boris Feldman and Doru Gavril of Freshfield for the defendants.

**THE COURT:**  Hello.

Okay.  This complaint definitely has to be dismissed, but I thought it would be worth chatting about it a little bit.  I think one of the many problems with this complaint is that it takes the spaghetti approach, you know, throwing all, you know, an entire pot of spaghetti at the wall and hoping something sticks, without really articulating, you know, what it is that you want to stick.  You know, you've got this chronology of statements.  You block quote a bunch of statements.  You bold some of the statements.  You intone that they are fault.  You have the same paragraph that you cut and paste, like, six or seven times in the complaint, explaining why they're false in this sort of generic way.  But it's --

you know, I think the problem is because you've tried to throw so much spaghetti at the wall, you've prevented me from focusing in any meaningful way on any one piece of spaghetti.

So let me ask you now to -- can you identify for me maybe your one or two favorite omissions or misrepresentations that you think are actionable, and show me where they are in the complaint and show me why they are actionable.

**MR. LUDWIG:**  Certainly, Your Honor.  I think that the company, first of all, misrepresented to American investors the extent to which they would be deprived of benefitting from dividends from the company's listing on the Shanghai exchange.

**THE COURT:**  Okay.  So one -- so you're -- is that your favorite one?  Is that your favorite misrepresentation or omission?  Is that your strongest one?

**MR. LUDWIG:**  Your Honor, I have to confess that before I came in, I wasn't thinking in terms of favorites, but it's one that strikes me as very clearly understandable, not requiring a lot of explanation, because the company used --

**THE COURT:**  Well, it doesn't -- if it requires a lot of explanation, that's fine, as long as the explanation is included in the complaint.  But -- so I'm asking you -- just to make clear, in case it's not clear, I'm asking you to give me your one or two strongest claims for securities fraud, what -- your strongest argument for an actionable omission or

misrepresentation.  Okay?  One or two.

MR. LUDWIG:  That was one of them, Your Honor.

THE COURT:  Okay.  So summarize it again for me.

MR. LUDWIG:  That related to the entitlement of American investors to dividends from the company once it was listed on the Shanghai Stock Exchange, which it still has not been listed on, due in part to the disclosures made by JCAP discussed in the complaint.  That's --

THE COURT:  Okay.  So that's one.  What's your second favorite?

MR. LUDWIG:  My second favorite would be the related party transactions, where the customers of the company were also selling on behalf of the company.

THE COURT:  Okay.  And so starting with the first one, entitlement to dividends from the company, American investors' entitlement to dividends from the Shanghai company, can you show me where in the complaint that you identify the relevant misrepresentation or omission?

MR. LUDWIG:  Yes, Your Honor.  Yes.

(Pause)

MR. LUDWIG:  Yeah, it's discussed right here at Paragraph 13, where it says, "American investors will be unable to access" --

THE COURT:  Okay.  Wait, hold on a second.  Let me get there.  Okay.  So J Capital published an update in

November -- on November 17th to their October 8th report, and in it -- this is you describing J Capital's report, or update -- you say -- and the update says, "American investors will be unable to access any profits that could come from ACMR's Shanghai subsidiary, where 90 percent of the company's business takes place."

Okay.  So that is what the report says, but that's not -- so where does the complaint explain how investors were misled regarding that?  The idea is investors must have been under the impression that they were going to be able to access profits that came from the Shanghai subsidiary, so where is it in the complaint that you describe something that the defendants said or did that would suggest that American investors would be able to access profits from the Shanghai subsidiary?

**MR. LUDWIG:**  One moment, Your Honor.

(Pause)

**MR. LUDWIG:**  This is the statement that's pointed to, and it's in defendants' brief, that -- and this is the statement that I was looking for, that under existing Chinese laws --

**THE COURT:**  But I want to -- I mean, you need to show -- the complaint needs to allege it, right?

**MR. LUDWIG:**  Right.

**THE COURT:**  The complaint needs to adequately

allege -- you're saying that your favorite theory is -- of securities fraud is that they misled the public with respect to entitlement to dividends from the Shanghai subsidiary.  So where do you explain that -- if I'm reading the complaint and trying to decide if the complaint alleges a cause of action based on that theory, where do I go in the complaint?

**MR. LUDWIG:**  The company made various statements throughout the class period, Your Honor, regarding the STAR listing and IPO.  I mean, for example, in Paragraph 39, they discussed --

**THE COURT:**  Wait, hold on, let me go to Paragraph --

**MR. LUDWIG:**  They discussed the critical nature --

**THE COURT:**  Okay, hold on.  Let me just go to --

**MR. LUDWIG:**  Sure.

**THE COURT:**  Let me get to Paragraph 39 so I can follow along with you, okay?

**MR. LUDWIG:**  Yes.

**THE COURT:**  Okay.

**MR. LUDWIG:**  In Paragraph 39, the company states the importance of the STAR IPO that they're dependent on the listing to realize the advantages of their Chinese operations, including improving their ability to market products, build their brand in PRC markets, and assist their sales efforts to new customers and encourage additional purchases of tools by existing customers.

**THE COURT:**  But where does that suggest that American investors are going to be able to get dividends from the Shanghai subsidiary?

**MR. LUDWIG:**  The point is, Your Honor, that the company cannot tout the Shanghai subsidiary IPO without mentioning that the American investors, who they're depending on for the funds to under take that IPO, won't be able to benefit from it.

**THE COURT:**  Well, but they talk about what the benefit is, and it's something other than realizing dividends from the Shanghai subsidiary, right, according to this paragraph in -- Paragraph 39, this quote from Paragraph 39. They're saying "improve our ability to market our products, building our brand in the PRC markets, assisting our sales efforts to new customers, encouraging additional purchases of our tools," but they're not -- you know, so it seems like they are, in fact, describing, you know, benefits, but those benefits are not -- appear to be something different from drawing dividends from the Shanghai subsidiary.  So I don't understand how that paragraph supports your theory.

**MR. LUDWIG:**  They're leading up -- that's a -- it's a detriment, actually, Your Honor.  It's a detriment that the investors cannot realize any of those profits.

**THE COURT:**  Right.

**MR. LUDWIG:**  So in other words, they're touting the

benefits of the listing while leaving out the detriments of the listing.  And so that, in and of itself, would be a misrepresentation by omission.

**THE COURT:**  Okay.  Do you have anything -- is there anything else in the complaint?  Is your theory basically that they should have said, you know, you're not going to be able to get dividends from the -- that it's an omission because any time they talked about the Shanghai IPO without specifying that American investors were not going to be able to get profits from the Shanghai subsidiary, that that constituted a material omission?  Is it an omissions theory that you're going on here?

**MR. LUDWIG:**  I think for this particular misrepresentation, that is the case.

**THE COURT:**  Okay.  But --

**MR. LUDWIG:**  Although I would treat it -- it's not just a question of whether they -- if they ever spoke about the Shanghai IPO in a general sense.  It's a question of when they spoke to American investors about the benefits that they would derive from the Shanghai IPO.

**THE COURT:**  Okay.  Do you have any --

**MR. LUDWIG:**  (Indiscernible) information that the company had the option of leaving out.

**THE COURT:**  But this says -- you know, you're quoting Paragraph 39, which is a statement that they made in

the wake of publication of the J Capital report, right?  And so the truth was revealed by the J Capital report, right?  And so what is it that they said before the J Capital report that created a -- would have created a misimpression for investors that they would have been able to derive dividends from the Shanghai subsidiary?

MR. LUDWIG:  It would have been when the company announced on -- so in Paragraph 38, when the company announced the approval of the proposed listing, which ultimately didn't come to fruition because of what was revealed in the J Capital report --

THE COURT:  So just announcing the -- the approval -- announcing the approval of the proposed listing? When you do that, you have to specify that American investors are not going to be able to get profits from the subsidiary? Is that the theory?  It's sort of a material omission at that point?

MR. LUDWIG:  I think that would be one example. Another example would be Paragraph 111.

THE COURT:  All right, hold.  Give me a second to get there.  Okay, go ahead.

MR. LUDWIG:  In which they say, and that's the -- this is the bolded text, not the entire text of the excerpted paragraph.  But the company says, "And also last year, we're [sic] started planning our subsidiary in Shanghai to go to the

STAR market in China.  Our goal is really more of expanding, penetrate the local China market at the same time with not in a structure, also maintain good sales and marketing, and on the fourth, to penetrate the market outside of China.  So our goal, we believe, eventually half" -- where they say "half our revenue comes from inside the China market," that's a direct result of the listing on the STAR market.  And so what they're doing here, again, is touting the benefits of the listing while leaving out the negative portion -- negative part of the listing for American investors.

THE COURT:  You're saying this --

MR. LUDWIG:  (Indiscernible) targeting what they --

THE COURT:  -- bolded, this second paragraph, this bolded second paragraph implies that investors in the American company are going to be able to draw profits from the Shanghai company?

MR. LUDWIG:  What the company's saying here, Your Honor, is that half the revenue will come from inside of the China market.  And the reason they're telling the American investors that, it's because that's something that would be attractive to American investors.

THE COURT:  Okay.  And -- okay.  Anything else on that in support of that theory?

MR. LUDWIG:  I think those are examples from the complaint that at least show that there's a discrepancy

between what the company said to investors and what the reality was, as revealed by the J Capital report.

THE COURT:  Okay.  And then, the next one is the related party transactions.  For the related party transactions, what is your theory of securities fraud, as apart from your theory of wrongdoing?  I mean, I think I understand the theory of wrongdoing, right, which is that, you know, basically, the company is allowing money to be siphoned off by, you know, people who have a stake in the company, sort of siphoning off profits.  What's the theory of securities fraud?  Like, what -- if you're describing the manner in which the defendants misled the investing public relating to that, what's -- how do you explain that?

MR. LUDWIG:  You're misrepresenting the company's actual sales to investors if you're not including that information.  If you're not including the fact that you have dummy sales going on that are likely being orchestrated by company insiders in a conflicted manner, then you're not presenting investors with a -- an accurate and fair representation of what the company's sales are.

THE COURT:  So the company's sales are better -- the company's actual sales are better than what is reflected in the numbers that they're putting out?  Is that the idea?

MR. LUDWIG:  Those -- the figures that are being put out are inaccurate, and I'd say that would be the overall

theme to the complaint as currently pled, that in various respects, the J Capital investigation exposed that the company was misleading investors about critical aspects of the business, what was actually going on internally within the company. And for that reason, those statements were incorrect. That's a straightforward theory.

**THE COURT:** What statements were incorrect? That's what I'm trying to pin you down on. What -- which statements were -- are -- as it relates to the related parties aspect of this, which you've identified as your kind of second favorite theory of securities fraud, what are the statement that are -- again, I guess, maybe I should ask you. Is this an omissions theory or is it a theory that there were some misleading statements given in relation to this related parties business?

**MR. LUDWIG:** Well, Your Honor, that would be an omissions theory because the company did not disclose that it was engaging in related party transactions to any extent.

**THE COURT:** Okay.

**MR. LUDWIG:** So if they had disclosed it in some partial manner and then not disclosed other information relating to those same transactions, then it would be more of a straightforward misrepresentation theory.

**THE COURT:** Okay. So you're saying it's just they neglected to disclose that -- you know, they omitted that they were engaging in this -- in these self-dealing transactions.

And what did that do to the company's numbers?  How did that affect the company's revenue numbers?

**MR. LUDWIG:**  Well, those sales were counted among the company's sales, and so those distorted the sales.  I mean, if you're looking for an actual figure --

**THE COURT:**  Well, I'm just -- I'm asking -- I'm trying to figure out how -- and again, what matters is what's in the complaint and/or the report, right?  But I'm trying to figure out how this harmed investors, like, what -- what would have happened if the truth was -- you know, like, if they had been straight about what was happening, what would have happened to the stock price?  What's your theory of securities fraud?  What's your theory of harm to investors?

**MR. LUDWIG:**  The theory of harm to investors?  The theory is that it -- the investors in the company were entitled to accurate information as publicly disclosed by the company.  That's what the Securities Act of 1934 guarantees for investors.

**THE COURT:**  Okay.  And how -- what would the -- in what way were the numbers inaccurate as a result of this dealing, and where does it explain that in the complaint?

See, I think one of the problems -- I will allow you to answer that question, and you can take your time, but, you know, I think one of the problems here is that this, you know, short-seller report, it has a different objective from, you

know, the objective of a plaintiff's lawyer who's trying to state a claim from -- for securities fraud, right?  And so what you appear to have done here is largely just cut and paste portions of the short-seller report into your complaint and mostly just rely on the short-seller report, mostly incorporate the short-seller report.  And there's nothing wrong with incorporating a document by reference, but I think you create real problems for yourself when you overly rely on a report whose goal is not necessarily to state a claim for securities fraud, right?

I mean, you -- there are a number of parts of this report where all they seem to be doing -- it's hard to understand the report, but all they seem to be doing is looking at the numbers that the company ha disclosed to the American investing public and drawing conclusions from those numbers or, you know, raising concerns based on those numbers.  And so those aspects of the report don't seem like they state actionable claims for securities fraud to me because those aspects of the report are relying on information that the, you know, investing public already had.

**MR. LUDWIG:**  Your Honor, the investing -- if I may, the investing public did not have information that was reported to Chinese regulators that --

**THE COURT:**  Well, hold on, hold on.  I'm just speaking generally about the report as a whole, right?

**MR. LUDWIG:**  I don't think that's a correct characterization of the report, though.

**THE COURT:**  It is with respect to some aspects of it.  For example, the issue of cash on hand and reliance of credit and all that stuff, right?  I mean, they -- the report just analyzed -- it appears to me, I can't tell for sure -- but it appears to me the report simply analyzed the company's public disclosures, American public disclosures, and raised concerns about whether the cash on hand number was legit, right, in light of all of these lines of credit that the company had taken, all of which, as far as I can tell, were disclosed to the American investing public.  And so it seems to me that that's an example of you're really doing yourself a disservice by simply relying on the report, by simply incorporating the report and cutting and pasting portions of the report into your complaint and parroting the allegations of the report.  It seems you have a number different task in front of you, which is to state a claim for securities fraud, right, and explain in clear terms the ways in which the defendants materially misled the American investing public. And so I think you probably need to do those in your own words in the complaint rather than just relying on -- you know, rather than just parroting this report.

But in any event, I mean, I think that's one of the many problems with your complaint, the other big problem being the

spaghetti at the wall thing that I was talking about earlier. You know, your -- you know, it's like trying to find a needle in a haystack, looking for securities fraud.  Instead of throwing all the spaghetti at the wall, you should be identifying what you truly think is securities fraud and then clearly explaining why it's securities fraud.

But in any event, I took us on a detour, and it seems to me that -- well, I took a detour.  You were explaining where in -- you were identifying where in the complaint there is an explanation of how this related party bx sort of impacts investors.  So you were in the middle of looking for that, and I think I interrupted you, so I apologize for that, but --

**MR. LUDWIG:**  The impact on investors of related party transactions?

**THE COURT:**  Yeah.  How did it affect the company's numbers?  How did it impact investors?  Do you have an explanation in the complaint for that?

**MR. LUDWIG:**  Well, certainly.  We explain that the company presented inaccurate figures to investors.  And just to be clear --

**THE COURT:**  Too high?  Too low?  What figures? Which figures and were they too high or were they too low? How were they inaccurate, and where in the complaint do I go to develop an understanding of that?

**MR. LUDWIG:**  Well, in the categories of information

that are discussed in the complaint, that we discuss in our motion to dismiss their opposition, as well, the strength of the company -- where they discuss the strength of their financial results, where they discuss revenue, where they discuss profitability and cash flows (indiscernible) --

**THE COURT:**  Can you show me where in the complaint you -- where in the complaint do you explain the effect of the related party scandal on the company's numbers or on investors?

**MR. LUDWIG:**  Your Honor, I would hesitate to categorize it as a scandal, in that certain --

**THE COURT:**  Whatever -- however you want to categorize it --

**MR. LUDWIG:**  Right.

**THE COURT:**  -- where do you explain it, its effect on investors and on the numbers in the complaint?

**MR. LUDWIG:**  We explain it through the situations in which the -- the cited instances in which the company, either in its public filings or in its colloquies with analysts, discussed the company's financial picture without ever mentioning the fact that it was engaged in related-party dummy transactions, information that investors would be entitled to because that's material information.  And specifically, it relates to the company's Shanghai subsidiary, which is the source of a vast majority of the company's revenue.

**THE COURT:**  Okay.  And is the idea that if they had disclosed that, the stock would have gone down?

**MR. LUDWIG:**  I think that the better way to put that would be that investors would not have invested in such a company that was engaging in that conduct.  And that's (indiscernible) --

**THE COURT:**  So if investors would not have -- I'm just trying to think about how it relates to your client, the lead plaintiff in this case, and how it harmed him as the possessor of option contracts.

**MR. LUDWIG:**  Well, I would just add that the lead plaintiff in this case was found to be adequate and typical, sufficient for his appointment as the lead plaintiff by this Court, that --

**THE COURT:**  Right.  But as it relates to this particular theory, I'm wondering how he suffered -- how was he harmed by it?

**MR. LUDWIG:**  I think we would say that the whole class was harmed.  In fact, if we were to say that lead plaintiff was harmed in a manner that was different or diverged from the way that the rest of the class was harmed, we would be talking ourselves out of a lead plaintiff and saying that our lead plaintiff was, in fact, in conflict with the rest of the class or had a different interest in the rest of the class, which is something that we don't allege in the

complaint and that we don't agree with.

THE COURT: Okay. Mr. Feldman, do you want to respond to either of these points?

MR. FELDMAN: I would, unless you tell me you'd rather I not, Your Honor.

THE COURT: Well, I'm happy to hear from you.

MR. FELDMAN: Okay. Thank you. I'm sorry that we're not live today in the courtroom. I think we were all looking forward to being there in person.

I want to focus solely on the two points where you asked Mr. Ludwig to give you the best he's got. And as to the first one, that somehow the company allegedly misled US investors into thinking they would get dividends, please refer, Your Honor, to Docket 51-11. It's Exhibit K to our opening papers. And if I can give you a second to go to that.

THE COURT: I've got it. What page?

MR. FELDMAN: It's -- the printed page on the bottom is 16, one six. And this is a section that begins on Page 15 about requiring additional capital. And then on Page 16, there's a carryover paragraph with bullets. Then, there's the first full paragraph. I would like to direct the Court's attention to the second full paragraph.

THE COURT: Okay.

MR. FELDMAN: And I don't want to trouble the court reporter or anybody by reading extensively. I'll just go with

the punchline:  "As a result, it is unlikely that funds raised or generated by the ACM Shanghai will be readily distributable to ACM Research."

THE COURT:  And when was this statement made?

MR. FELDMAN:  It was filed on -- it was the Form 10-K.  I'm going up to the beginning of the exhibit.  It was filed -- it was for the fiscal year-end December 31, 2019.

THE COURT:  So filed around March or something of 2020?

MR. FELDMAN:  I believe so, Your Honor, and I will -- I have colleagues who know better who will ping me in a minute.  But it was after the completion of 2019.  So that goes directly --

THE COURT:  Looks like March 2020, as far as I can tell.  Okay.

MR. FELDMAN:  It says that at the top "Filed 05/21," but it's hard for me to imagine that.  I believe it would have been filed before then, but I will get the --

THE COURT:  That's filed in our -- on our docket on 5/21.

MR. FELDMAN:  Oh.  Your Honor, I think you're right. It appears when it gives the share numbers early in the document, it says March 17, 2020.

THE COURT:  Yeah.

MR. FELDMAN:  So I presume it was around then.  I'm

sorry.

THE COURT:  That's all right.

MR. FELDMAN:  So this goes directly to Mr. Ludwig's point and goes to the issue of your exercise of discretion as to whether or not to permit amendment again because what he chose as either his best, or one of his two best, legal claims was disclosed by the company in the annual report.

The other one is -- I think he referred to it as dummy revenue.  I did a quick search of the complaint.  You can never bet your life on Control-F, but I searched for "dummy." I didn't see that there.  What Your Honor drove him to in the complaint was Paragraph 11, and on Page 3, it's the fourth bullet down in the complaint.  Quote --

THE COURT:  Yeah.

MR. FELDMAN:  -- "Undisclosed related parties are diverting revenue and profit from the company.  This includes ACMR's suppliers making sales for the company and customers allowed to collect commissions on sales to themselves," close quote.

Even if one were to credit the anonymous short-seller, that does not allege a revenue recognition violation.  It says the way you do business is costing you money, but that is different than Mr. Ludwig saying, JCAP found dummy revenue. It's a different issue.

As Your Honor notes, the Ninth Circuit has many decisions

with respect to pleading accounting fraud, and the Court raised the exact questions that those decisions raise.  How much?  How material was it?  Give us details.  And there's none of it, not just in the JCAP report, but also in -- there's none in the complaint itself.

I would also note that in our opening brief, we addressed the related party transaction that was on our motion to dismiss.  That was on Page 10, where we rebutted that.  And in their opposition, they didn't respond to it.  So I was surprised to hear Mr. Ludwig now pick that as one of his two best claims, given that they did not respond to it in the opposition.  As Your Honor knows, there's law about that.

Final point -- two points, and I'll be quick.  Since we filed our papers, there was yet another decision by yet another district judge in this court, holding that you can't base a complaint on short-seller allegations and that the --

**THE COURT:**  But, I mean, I -- I don't think that's categorically correct, and if some district judge says, categorically, you can never base a complaint on short-seller allegations, I think that must be wrong.  I mean, it depends on the allegations and how well-supported they are, right?

**MR. FELDMAN:**  Yes, absolutely.  There are now four judges in this district that have said a short-seller report, by itself, is not enough, and that's what we have here.

**THE COURT:**  But what if the -- what if the short

seller -- I mean, this short-seller report does not, but what if the short-seller report does a really good job of substantiating all its allegations and separating out which aspects of it are securities fraud versus just some other -- other problems with the company.  What if the short-seller report did that?  I mean, I would think that you could base your securities fraud claim solely on a short-seller report.

**MR. FELDMAN:**  Probably not consistent with the requirements of Rule 11.  As Your Honor knows, by statute, at the end of --

**THE COURT:**  No, what I'm saying is the report lays out -- like -- just like a good securities fraud complaint would, right, if the short-seller report, you know, lays out in detail and specificity plausible reasons why securities fraud is taking place, why can't you rely on it?

**MR. FELDMAN:**  I accept Your Honor's view because we don't need to go that far here.

**THE COURT:**  You probably have not seen any such short-seller report.

**MR. FELDMAN:**  Exactly.  And here, you don't need to test the theoretical bounds because this one doesn't come close.

And then, the final point as to amendment vel non, the plaintiffs have amended here.  There is no Rule 15 issue.  They got their, in effect, statutory, their rules right, to

amend.  In fact, you gave them extra time to do that, and I think you had a gentle admonition at the beginning about getting off on the wrong foot.

What's different here is Docket Item 55, which I haven't seen before.  In the old common law court, sometimes you would have counsel --

**THE COURT:**  What is that?  What is Docket 55 -- Docket Number 55?

**MR. FELDMAN:**  Mr. Ludwig's declaration that he's pleaded enough.

**THE COURT:**  Yeah, you don't -- I'm not going to -- that's not (indiscernible) to this --

**MR. FELDMAN:**  So to the extent a reviewing court would say, should they have been given yet another chance, you've now probed their best arguments, which are precluded on the face of the documents.  Counsel has already amended.  And in this, they've basically said, we talked to JCAP and we found it very credible.  So there's nothing here to justify putting this company through it again.

Thank you for your patience, Your Honor.

**THE COURT:**  Yeah.  I mean, I understand where you're coming from.  I mean, I'm pretty skeptical that, you know, the plaintiffs will ever be able to state a claim here without doing, you know, some sort of independent investigation independent of what -- of just, like, reading this report.

But, you know, they say they looked at the documents, but -- then why don't we have a description of the documents in the complaint that they looked at?  I don't know.

But I think that, you know, maybe this is sort of ironic, but I think part of the problem is that the complaint is drafted so badly that I cannot be very -- cannot be 100 percent confident that they don't have the ability to state a claim for securities fraud if they do a better job of drafting the complaint.  And I understand the irony in that, but I don't think we're at a stage where I can dismiss the complaint with prejudice.

Do you -- let me ask you, Mr. Ludwig.  I mean, do you believe that you've taken your best shot, that you've done your best job of stating a claim for securities fraud here?

**MR. LUDWIG:**  I would have to say, Your Honor, that we were given a drastically limited amount of time.  Now, I know that Mr. Feldman has said in his argument that he thinks we were given an incredibly generous amount of time.

**THE COURT:**  Well, regardless of that --

**MR. LUDWIG:**  Mr. Feldman has probably been practicing securities law for as long as I've been alive, and I'm sure he knows what the standard amount of time that plaintiffs are typically given to conduct investigations --

**THE COURT:**  Okay.  But putting --

**MR. LUDWIG:**  -- and (indiscernible).

**THE COURT:**  -- putting all of that -- putting that aside, you're supposed to conduct an investigation before you file the lawsuit.  But --

**MR. LUDWIG:**  Well, we certainly did do that, Your Honor.  I wasn't precluding that.  I was talking about the standard practice in securities fraud lawsuits specifically where one firm files an amended complaint based on the publicly available information.  There's a lead plaintiff contest, so Mr. Feldman's also inaccurate in pretending as though we came in, filed a complaint, and then we filed another complaint.  In fact, there was another firm that moved for lead plaintiff.  There was a contested lead plaintiff contest, after which we ended up being the lead plaintiff.  That was not a foreordained conclusion, though.

And after that time, we were given approximately (indiscernible) --

**THE COURT:**  So I don't know if you heard what I just said to Mr. Feldman, but do you think that you've done -- you've given it your best shot, you've taken your best shot?

**MR. LUDWIG:**  In the time that we were granted, I would say yes, but then I would have to qualify that answer by saying that we operated on substantially less time than most securities plaintiffs do, and I would be happy to, you know, undertake a review of dockets in the Northern District of California with respect to the amount of time that plaintiffs

are typically granted to amend in these cases.

**THE COURT:** Look, don't worry about that. I'm trying to -- I'm just trying to get a sense of whether you think you've done a good job of stating a claim for securities fraud here or not. Because -- and I'm trying to get a sense of whether it's worth it to give you leave to amend, right? I mean, I'm trying to get a sense of whether you think you can do a better job or you've sort of done your best by parroting this report and putting it in a complaint.

**MR. LUDWIG:** I think it's incorrect to say that we parroted the report, Your Honor, in that we certainly did -- that is the disclosing event, and so, of course, the allegations in the complaint are going to relate to the report. But we did undertake an independent investigation, and that was the purpose of my declaration to rebut the idea that we did not, in fact, conduct an investigation and that we didn't review documents and that all we did was copy and paste the report, because that is not the case, I can assure you personally.

**THE COURT:** Okay. Do you -- would you like leave to amend?

**MR. LUDWIG:** Yes, Your Honor.

**THE COURT:** Okay. All right. So for all of the reasons we've discussed here, I'm going to dismiss the complaint. I'll give you leave to amend. You know, as I

said, I -- although I'm rather skeptical that, you know, claim for securities fraud can be stated based on what I have seen, it's -- I can't rule out the possibility that if the plaintiffs do a much better job of explaining things that there might be something in there.  So I'm going to grant leave to amend.

How much time do you want to amend your complaint?

MR. LUDWIG:  We would ask for 45 days to amend, Your Honor.

THE COURT:  I'll give you 28.  So the -- so an amended complaint is -- so the complaint is dismissed and amended complaint is due 28 days from today.

MR. LUDWIG:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

MR. FELDMAN:  Thank you, Your Honor.

(Proceedings adjourned.)

**C E R T I F I C A T I O N**

I, Ilene Watson, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

Ilene M. Watson, AAERT No. 447

Monday, September 13, 2021