**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY KAIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACM RESEARCH, INC., DAVID HUI WANG, LISA FENG, and MARK A. MCKECHNIE,<br><br>Defendants. | Case No: 3:20-cv-09241-VC<br><br>**CLASS ACTION**<br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Honorable Vince Chhabria<br><br>DEMAND FOR JURY TRIAL |

1

Lead Plaintiff Jeffrey Kain ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, for Plaintiff's second amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts and other information prepared for investors by ACM Research, Inc. ("ACM", "ACMR", or the "Company"), as well as media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      During the Class Period and beyond, the Company pushed for an IPO of its Shanghai subsidiary in order to raise cash.

2.      At the same time, ACM is dependent upon access to the U.S. for critically-needed parts and investment capital.  In the U.S., ACM currently trades on the NASDAQ.

3.      In its web of self-dealing and presence before two international stock exchanges, ACM misled the very U.S. shareholders who it plans will fund the operations of ACM's Shanghai subsidiary, with little if any upside, once the subsidiary IPO goes through.

4.      ACM failed to disclose its "agent" sale business model – by which nearly all of its sales are made to designated intermediary agents rather than end customers and failed to disclose i) any of the five designated agents to U.S. investors prior to the J Capital report or ii) that at least three of the five agents are related parties. This information was crucial to investors' understanding of ACM's business.

1

5.      Given that, by ACM's own admission, the success of its subsidiary IPO is of existential importance to the Company, Defendants were, at all relevant times, motivated to present a positive image of the Company to American investors.

6.      Thus far, Defendants were only prevented from deceiving their own shareholders due to the dogged efforts of a third-party stock analyst.

7.      In this federal securities class action on behalf of all those who purchased or otherwise acquired ACM securities between March 6, 2019 and November 16, 2020, inclusive (the "Class Period"), Plaintiff seeks to pursue remedies against ACM and certain of the Company's current and former senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

8.      ACM, together with its subsidiaries, develops, manufactures, and sells single-wafer wet cleaning equipment for enhancing the manufacturing process and yield for integrated chips worldwide. The Company markets and sells its products under the "Ultra C" brand name through direct sales force and third-party representatives.

9.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's revenue and profits had been diverted to undisclosed related parties; (ii) accordingly, the Company had materially overstated its revenues and profits; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

10.      On October 8, 2020, stock-research analyst J Capital Research ("J Capital") published a report concerning ACM, in which J Capital concluded that ACM "***is a fraud, over-reporting both***

*revenue and profit*."[1] The report cited, among other things, J Capital's visits to sites in China, Korea, and California and more than 40 interviews.

11.     The J Capital report raised several concerns regarding ACM's operations and financials including misreporting of revenues and margins, ACM's cash position, and undisclosed individuals diverting revenue and profit from the Company.

12.     More specifically, the J Capital report revaled –

- that inventory levels were suspiciously high, with 45% of total inventory not paid for and sitting on customer premises.

- a material level of sales to undisclosed related parties;

- that cash is missing in ACM's Shanghai subsidiary IPO company accounts versus its U.S. GAAP accounts; and

- that ACMR's actions showed a need for cash inconsistent with the $86 million cash it reported on the balance sheet. ACMR had $25.77 million in short-term borrowings in Q2 2020, up by $21.88 million quarter-over-quarter. ACMR's CEO has personally guaranteed 11 of 13 short-term "lines of credit" issued on the Chinese mainland.

13.     After the Company failed in its attempted rebuttal of the J Capital report, ACM's stock price fell $1.09 per share, or 1.52%, to close at $70.79 per share on October 8, 2020.

14.     Next, on November 17, 2020, following the release of quarterly results, J Capital published an update to their October 8 report. The update disclosed, among other things, that –

- ACM's assumption of debt was inconsistent with its stated cash position.

- ACMR's reliance on 15 lines of credit did not comport with its alleged possession of unencumbered assets in Mainland China, where its debt obligations were also located.

- American investors will be unable to access any profits that could come from ACMR's Shanghai subsidiary, where 98% of the Company's business takes place.

15.     In response to the November 17 update, ACM's share price fell by $4.03 per share, or 5%, to close at $77.79 per share on November 17, 2020.

---

[1] Emphasis added throughout, unless otherwise noted.

3

16.     As a result of Defendants' wrongful acts and omissions, and the decline in the price of ACM common shares detailed herein, Plaintiff and other members of the Class (as defined below) have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     Jurisdiction is conferred by Section 27 of the Exchange Act.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.  Defendant ACM maintains its corporate headquarters in this District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

20.     Plaintiff, as set forth in his previously-filed Certification (Dkt. No. 23-5), which is incorporated by reference herein, purchased or otherwise acquired ACM securities during the Class Period and has been damaged thereby.

21.     Defendant ACM is a Delaware corporation that was founded in 1998 and headquartered in Fremont, California.  The Company, together with its subsidiaries, develops, manufactures, and sells single-wafer wet cleaning equipment for enhancing the manufacturing process and yield for integrated chips worldwide.  ACM's securities trade on the Nasdaq Global Select market ("NASDAQ") under the

ticker symbol "ACMR."

22.     Defendant David Hui Wang ("Wang") has served as ACM's Chairman, Chief Executive Officer ("CEO"), and President at all relevant times.

23.     Defendant Lisa Feng ("Feng") served as ACM's Interim Chief Financial Officer from prior to the start of the Class Period until November 2019.

24.     Defendant Mark A. McKechnie ("McKechnie") has served as ACM's Chief Financial Officer since November 2019.

25.     The Defendants referenced above in ¶¶22-24 are sometimes referred to herein collectively as the "Individual Defendants."

26.     The Individual Defendants possessed the power and authority to control the contents of ACM's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of ACM's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with ACM, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

27.     ACM and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     ACM, a semiconductor manufacturer, was founded in 1998 in Silicon Valley, and initially developed tools for wafer processing steps involving the integration of copper and ultralow dielectric materials.

29.     ACM, together with its subsidiaries, develops, manufactures, and sells single-wafer wet cleaning equipment for enhancing the manufacturing process and yield for integrated chips worldwide. The Company markets and sells its products through direct sales force and third-party representatives.

30.     Though ACM is an American company, and had its U.S. initial public offering ("IPO") in 2017, the Company's sole US operations – "ACM Research (CA)" – during the Class Period consisted of 5 employees, occupying a 3,000 square foot office and warehouse space in Fremont, California. The function of this entity is to provide procurement services on behalf of ACM's Shanghai subsidiary:



## Corporate Structure

Note 1: ACM Sold all shares in CleanChip to ACM Shanghai for $3.5m in Dec. '2019
Note 2: It would appear that ACM Korea was *formed* as a subsidiary of ACM but is currently a subsidiary of CleanChip

Endpoint of blue arrows shows wholly owned subsidiary of entity at the beginning of the arrow
e.g. ACM Research (CA) is a wholly owned subsidiaries of CleanChip Technologies.

31.     Substantially all of the Company's product development, manufacturing, support and services are in Mainland China. Twenty-eight of the company's 361 full-time employees are located in Korea, and the rest are in China and Taiwan. All the company's sales in 2018, 2019, and 2020 were made to customers outside the United States2

32.     The Company currently has only one demo tool in the U.S. - a megasonic technology-based wafer wet cleaning tool (SAPS II) at an undisclosed U.S. R&D lab.

33.     ACM's heavy reliance on the Asia-Pacific region for growth is underscored by just three

customers in China accounting for 73.8% of the Company's revenue in 2019; two customers based in China (PRC) accounting for 54% of revenue; Korea-based SK Hynix accounted for 19.8% of revenue; and the Chinese Mainland accounted for ***96% of ACM's total main operating income.***

34.     ACM expanded its operations into Asia in 2006 and formed the subsidiary, ACM Research (Shanghai), Inc. ("ACM Shanghai").

35.     As discussed and documented in the J Capital report and update, ACM Shanghai was a significant locus of the Company's fraudulent activities.

36.     In June 2011, the Company formed a second subsidiary, ACM Research (Wuxi), Inc.

37.     In addition, ACM purports to have a presence at various locations outside China, including Taiwan, Korea, and the U.S., because even though ACM manufactures its equipment in China, it apparently needs parts from the U.S. During ACM's the quarterly earnings call held in August 2020, Defendant McKechnie stated as follows:

> Again, as you know, a lot of our supply chain, we're fortunate is in Asia. China is certainly back to business as we speak. ***There are some components that we have to get in Japan or even some in the U.S. that we have seen some lead times stretch out.*** But we're managing it closely, and we feel we've got that mitigated.

38.     In May 2020 ACM Shanghai submitted its application for an initial public offering (IPO) of its shares on the Shanghai Stock Exchange STAR Market. If successful, the Company will be the first US-traded company to list a China-based subsidiary on the STAR market.

39.     Defendants' focus on offering-derived growth is unsurprising: ACMR's past and current executive team is better known for stock promotion than for corporate management. The former CFO, Xu Min, left soon after ACM's IPO to join China Online Education Group, which was fined for illegal practices in China, and UTStarcom, which entered into a deferred prosecution agreement with the United States Department of Justice in which it acknowledged engaging in criminal activity.

**Materially False and Misleading Statements Issued During the Class Period**

40.     The Class Period begins on March 6, 2019, when ACM issued a press release

announcing the Company's fourth quarter and fiscal year 2018 results. The press release stated, in relevant part:

- **Revenue**. *Revenue for 2018 was $74.6 million, up 104% from 2017, due primarily to an increase in revenue from single-wafer wet cleaning tools. Revenue for the fourth quarter of 2018 was $20.8 million, up 21% from the fourth quarter of 2017, due to an increased volume of tools shipped for revenue, and higher prices associated with these tools*.

**Outlook**

*For fiscal year 2019, the Company expects revenue to be approximately $100 million*.

41. On March 7, 2019, ACM hosted an earnings call with investors and analysts to discuss the Company's fourth quarter 2018 results (the "Q4 2018 Earnings Call"). During the scripted portion of the Q4 2018 Earnings Call, Defendant Wang touted, in relevant part:

We are excited by our business prospects and remain committed to gain the share with new products, new customers and more production steps. *For 2019, we expect revenue of $100 million, up 34%, reflecting strong demand from our existing customers*.

42. In addition, during the scripted portion of the call, Defendant Feng stated, in relevant part:

For the fourth quarter, revenue was 20.8 million, up 21%. ***Growth was driven by solid demand for our single-wafer cleaning equipment***. Total shipments were approximately 32 million compared to 13 million last year. ***And the 32 million last quarter total shipments, including tools shipped and recognized as revenue in the quarter plus shipments pending customer acceptance.***

43. The statements referenced in ¶¶41-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the Company's expected revenue was inflated by ACM's reliance on sales to undisclosed related parties;

(v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

44.     Further, in describing the Company's customers and its sales and marketing, the 2018 10-K stated, in relevant part:

> We generate most of our revenue from a limited number of customers *as the result of our strategy of initially placing single-wafer wet cleaning equipment with a small number of leading chip manufacturers that are driving technology trends and key capability implementation.* In 2018, 85.7% of our revenue was derived from three customers: Yangtze Memory Technologies Co., Ltd., a leading PRC memory chip company, together with one of its subsidiaries, accounted for 38.8% of our revenue; Shanghai Huali Microelectronics Corporation, a leading PRC foundry, accounted for 23.6% of our revenue; and SK Hynix Inc., a leading Korean memory chip company, accounted for 23.3% of our revenue. In 2017, 55.2% of our revenue was derived from four customers: SK Hynix Inc. accounted for 18.1% of our revenue; Shanghai Integrated Circuit Research and Development Center Ltd., a public research consortia for the Chinese semiconductor industry, accounted for 14.1% of our revenue; JiangYin ChangDian Advanced Packaging Co. Ltd., a leading PRC foundry, accounted for 12.8% of our revenue; and Yangtze Memory Technologies Co., Ltd., together with one of its subsidiaries, accounted for 10.2% of our revenue.

45.     The statements referenced in ¶44 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

46.     Next, the 2018 10-K stated, in relevant part:

> *Revenue for the year ended December 31, 2018 compared to the year ended December 31, 2017 increased by $38.1 million. The increase was due to a $41.4 million increase*

*in revenue from single-wafer wet cleaning tools to our front-end customers, offset in part by a $3.2 million decline in revenue of tools to our back-end customers*. Our revenue for 2018 compared to 2017 reflected significant growth for three of our large front-end customers, partly offset by a decline at one front-end and one back-end customer.

47.     The statements referenced in ¶46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

48.     In addition, with respect to the Company's controls and procedures, the 2018 10-K stated, in relevant part:

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Accounting Officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, or the Exchange Act, as of December 31, 2018. The evaluation included certain internal control areas in which we have made and are continuing to make changes to improve and enhance controls. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

*Based on that evaluation, our Chief Executive Officer and Chief Accounting Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our*

*management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure.*

*Management's Report on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. ***Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with general accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent*** or detect misstatements. ***Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.***

Our management, with the participation of our Chief Executive Officer and Chief Accounting Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this assessment, our management used the criteria set forth in the Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2018***.

49.    The statements referenced in ¶48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) accordingly, the Company's internal controls and procedures were not effective; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

50.    On May 7, 2019, ACM issued a press release announcing the Company's first quarter 2019 results.  The press release stated, in relevant part:

ACM's President and Chief Executive Officer Dr. David Wang commented, "Business momentum continued, and we executed well relative to our expectations. ***We delivered solid revenue growth and profitability***, and we introduced two new electrochemical plating products. ***First quarter results demonstrate the competitive strength of our***

11

***technical expertise, product differentiation and production scale.*** All of our products, from SAPS, TEBO and Tahoe to our new Ultra ECP products, incorporate our innovative and differentiated technologies, which we have committed to continuously develop to exceed the expectations of our customers."

\*\*\*

- Revenue ***increased 110% to $20.5 million, due to an increased volume of tools shipped for revenue and higher prices associated with these tools.*** Revenue for the first quarter included repeat shipments, and several customer acceptances of tools shipped in previous quarters.

\*\*\*

**Outlook**

For fiscal year 2019, ***the Company continues to expect revenue to be approximately $100 million***.

51.     The statements referenced in ¶50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) The Company's expected revenue included sales to related parties; (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

52.     That same day, ACM hosted an earnings call with investors and analysts to discuss the Company's first quarter 2019 results (the "Q1 2019 Earnings Call"). During the scripted portion of the Q1 2019 Earnings Call, Defendant Wang stated, in relevant part:

***We delivered a solid revenue growth, excellent profitability***, and we introduce key new electrical plating or ECP products. First-quarter results demonstrate the competitive strength of our technical expertise. Product differentiation and the production scale. Revenue would double from the same period last year, solid operating leverage grew

gross margin of a 43.1% and operating margin of 14.6%. We ended the quarter with more than $27 million of cash.

\*\*\*

We are excited by our business prospects and remain committed to gaining share with new products, new customers, and a more production steps. ***We are maintaining our guidance for the full year for 2019. We'll continue to expect a revenue of highly million up 34% which reflects the strong demand from our existing customers***. Importantly, visibility for the full-year improved due to a solid orders and a customer forecast during Q1.

To conclude, our solid results show that we are executing our strategy, we are participating in the growth of our major new [indiscernible]. We are ramping production at our new factory, and we continue to deliver innovative and new products. We remain committed to achieving our vision of become a major player in a semiconductor equipment market. We look forward to continuing to deliver strong results in the balance of this year and beyond.

53.    In addition, when asked a question regarding improved visibility, Defendant Wang responded, in relevant part, "[b]ut based on our forecast and also our tool has been shipped last year which is some of them we recognized revenue this year. ***So where we are fully confident about a $100 million revenue in 2019***." Further, during the scripted portion of the Q1 2019 Earnings Call, Defendant Fang stated, in relevant part, "[r]evenue was $20.5 million, up 110%. ***Growth was driven by solid demand for our single wafer cleaning equipment and our back end tool***. And we had a customer acceptances at a first the tools that had shipped in prior periods."

54.    In addition, when asked a question regarding improved visibility, Defendant Wang responded, that "***we are fully confident about a $100 million revenue in 2019***."

55.    The statements referenced in ¶¶52-54 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to

undisclosed related parties; (iii) The Company's expected revenue was inflated by undisclosed future sales to undisclosed related parties; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

56.    On May 14, 2019, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting he Company's financial and operating results for the quarter ended March 31, 2019 (the "Q1 2019 10-Q"). The Q1 2019 10-Q touted a substantively similar overview of the Company as referenced in ¶44, *supra*. Further, the Q1 2019 10-Q stated, in relevant part:

> **The increase in revenue of $10.7 million** in the three months ended March 31, 2019 as compared to the same period in 2018 reflected increases in revenue of $3.3 million from single-wafer cleaning equipment, and **a $7.4 million increase in revenue from back-end equipment and spares. The revenue increase reflected an increased number of tools shipped, coupled with higher selling prices associated with the equipment sold and customer acceptances from prior period shipments received and recognized as revenue during the three month ended March 31, 2019**.
>
> ***
>
> Cost of revenue increased $7.0 million and **gross profit increased $3.7 million in the three months ended March 31, 2019**, as compared to the corresponding period in 2018, primarily due to increased sales volume.

57.    The statements referenced in ¶56 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

14

58.     Finally, with respect to controls and procedures, the Q1 2019 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

....

***Based on the evaluation of our disclosure controls and procedures as of March 31, 2019, our chief executive officer and interim chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective***.

59.     Appended to the Q1 2019 10-Q as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wang and Feng, attesting that, "the information contained in the [Q1 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of ACM Research, Inc. for the period presented therein."

60.     The statements referenced in ¶¶58-59 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) the Company had overstated its cash position; (iv) accordingly, the Company's internal controls and procedures were not effective; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

61.     On June 6, 2019, Defendant Wang spoke at the Company's annual shareholder meeting and said, in pertinent part:

***Our growth is driven by share gains in the $3 billion market for single-wafer wet-cleaning tools***. We have gained share with new customers, new product and the penetration of additional production steps. We also believe our opportunity for growth will increase as industry moves forward to more advanced nodes and 3-dimensional architectures.

Our 2018 results demonstrate[ ] excellent progress towards our strategic objectives. ***For 2018, we grew revenue by 104% to $74.6 million driven by a robust customer demand for our tools and the quick speed execution …. We generated $6.9 million in cash flow from operations and ended the year with more than $27 million in cash.***

62.     The statements referenced in ¶61 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) the Company's 2018 cash position was overstated by nearly $15 million; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

63.     On August 7, 2019, ACM issued a press release announcing the Company's second quarter 2019 results.  The press release stated, in relevant part:

ACM's President and Chief Executive Officer Dr. David Wang commented …. " As we look ahead to the remainder of 2019, we are excited by our business opportunities.  ***We have strong demand***, our visibility remains solid, and the team is executing to plan."

\*\*\*

- **Revenue *increased 39.0% to $29.0 million, due to an increased volume of tools shipped for revenue and higher prices associated with these tools*** … .

\*\*\*

**Outlook**

The Company **has increased its full year 2019 revenue guidance to $105 million, an increase of $5 million from the Company's previous 2019 revenue guidance**.

64.     The statements referenced in ¶63 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to

16

undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

65.    On August 8, 2019, ACM hosted an earnings call with investors and analysts to discuss the Company's second quarter 2019 results (the "Q2 2019 Earnings Call").  During the scripted portion of the Q2 2019 Earnings Call," Defendant Wang stated, in relevant part:

> ***Revenue grew to $29 million up 39% from last year, a strong top-line good growth margin and disciplined spending resulted in high-teens operating margin for the quarter***. Total shipments rebounded to $33 million up more than 50%. ***We ended the quarter with $27.6 million of cash.***
>
> ***
>
> For 2019, we're raising our revenue outlook to US$105 million, representing more than 40% annual growth. This is an increase of $5 million from the guidance we provided on last quarter's call. ***Our outlook reflects strong demand from our existing customers. We have a good visibility for the remains of the year, due to solid order and forecasts provided by our key customers***.

66.    Further, also during the scripted portion of the Q2 2019 Earnings Call, Defendant Feng stated, in relevant part, "***Revenue was $29 million, up 39%. Growth was driven by solid demand for our single-wafer cleaning equipment and our back-end tools***."

67.    The statements referenced in ¶66 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) for the same reason, the Company's expected revenue for "the remains of the year" was also overstated; (iv) the Company's cash position was overstated; (v) the foregoing, once revealed,

would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

68.     On August 12, 2019, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "Q2 2019 10-Q").  The Q2 2019 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*.  Further, the Q2 2019 10-Q stated, in relevant part:

> ***The increase in revenue of $8.1 million in the three months ended June 30, 2019*** as compared to the same period in 2018 reflected ***increases in revenue of $9.7 million from single-wafer cleaning equipment*** . ***The revenue increase reflected an increased number of tools shipped, coupled with higher selling prices associated with the equipment sold and customer acceptances from prior period shipments received and recognized as revenue during the three month ended June 30, 2019.***

> ***

> …. ***gross profit increased $4.4 million*** in the three months ended June 30, 2019, as compared to the corresponding period in 2018, primarily due to increased sales volume.

69.     The statements referenced in ¶68 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

70.     Finally, with respect to controls and procedures, the Q2 2019 10-Q stated, in relevant part:

> **Disclosure Controls and Procedures**

> ….

***Based on the evaluation of our disclosure controls and procedures as of June 30, 2019, our chief executive officer and interim chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.***

71.     Appended as an exhibit to the Q2 2019 10-Q was substantively the same SOX certification as referenced in ¶59, *supra*, signed by Defendants Wang and Feng.

72.     The statements referenced in ¶¶70-71 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (vi) the Company inflated its cash position; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

73.     On November 6, 2019, ACM issued a press release announcing the Company's third quarter 2019 results.  The press release stated, in relevant part:

> ACM's President and Chief Executive Officer Dr. David Wang commented, "We delivered record revenue and shipments, demonstrating our ability to scale production to major customers. We had several important deliveries in the quarter, including a "first tool" to our newest customer, an emerging China-based DRAM manufacturer, and several ECP AP tools to a major packaging customer. ***With a successful U.S. capital raise, we now have $47 million in cash, which puts us in a good position to support our growth plans***."
>
> ***
>
> * Revenue *increased 44.2% to $33.4 million*, due to an increased volume of tools shipped for revenue and higher prices associated with these tools.  Revenue for the quarter was entirely driven by repeat shipments, with no acceptances contributing to revenue for the period.
>
> ***

**Outlook**

***For fiscal year 2019, the Company continues to expect revenue to be approximately $105 million.***

74.     The statements referenced in ¶73 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (vi) the Company's expected revenues were inflated due to its reliance on related party transactions; (v) the Company inflated its cash position during; (vi) U.S. investors will not be able to access any profits that could come from the Shanghai subsidiary; (vii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

75.     On November 7, 2019, ACM hosted an earnings call with investors and analysts to discuss the Company's third quarter 2019 results (the "Q3 2019 Earnings Call").   During the scripted portion of the Q3 2019 Earnings Call, Defendant Wang stated, in relevant part:

> ***Our third quarter results mark another quarter of great financial results, new product development, and strategic progress. We delivered record revenue, record shipments, strong bottom line growth and we're strengthening our balance sheet.*** This result validated our technology, our spending product portfolio, and our ability to scale production. We remain focused on our mission to become a major proprietor of technical equipment to the semiconductor industry. ***Revenue growth of $33 million, up 44%,*** our customers push us to deliver high volume tools in the third quarter as they scale their own production capacity, with some key delivers accelerated from the fourth quarters.
>
> ***
>
> ***For 2019, we continue to expect our revenue to be approximately $105 million. This represents more than 40% annual growth. We are proud of this growth***, given a

20

challenging year for the industry. As we look to 2020, we plan for growth. We plan to provide formal guidance for the full year 2020 on our next earnings call.

76.     Further, also during the scripted portion of the Q3 2019 Earnings Call, Defendant Feng stated, in relevant part, "*[r]evenue was $33.4 million, up 44%. Growth was driven by solid demand for our single-wafer cleaning equipment and our new ECP copper plating tools for advanced packaging*."

77.     The statements referenced in ¶¶75-76 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the Company's expected revenues were inflated due to its reliance on related party transactions; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

78.     On November 13, 2019, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting he Company's financial and operating results for the quarter ended September 30, 2019 (the "Q3 2019 10-Q").   The Q3 2019 10-Q touted a substantively similar overview of the Company as referenced in ¶44, *supra*.  Further, the Q3 2019 10-Q stated, in relevant part:

> *The increase in revenue of $10.3 million in the three months ended September 30, 2019* as compared to the same period in *2018 reflected increases in revenue of $5.7 million* from single-wafer cleaning equipment, and increases in revenue of $4.6 million from back-end wafer assembly and packaging equipment. *The increase in revenue was driven by a higher number of tools shipped for revenue, offset by a decrease in customer acceptances from prior period shipments received and recognized as revenue during the three months ended September 30, 2019*.

\*\*\*

21

*.... gross profit increased 6.0 million in the three months ended September 30, 2019*, as compared to the corresponding period in 2018, due to increased sales volume and higher gross margin.

79.     Finally, with respect to controls and procedures, the Q3 2019 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

....

*Based on the evaluation of our disclosure controls and procedures as of September 30, 2019, our chief executive officer and interim chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.*

80.     Appended as an exhibit to the Q3 2019 10-Q was substantively the same SOX certification as referenced in ¶59, *supra*, signed by Defendants Wang and McKechnie.

81.     The statements referenced in ¶¶79-80 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the Company inflated its cash position; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

82.     On March 18, 2020, ACM issued a press release announcing the Company's fourth quarter and fiscal year 2019 results.  The press release stated, in relevant part:

ACM's President and Chief Executive Officer Dr. David Wang commented, "2019 was a remarkable year for ACM Research as we expanded our customer base, launched new products, and ramped production capacity at our second factory. *We delivered 44% revenue growth, expanded operating margins, and generated more than $9 million in*

22

*cash flow from operations. We grew our cash balance to $58 million at year-end, with an additional $60 million of proceeds held in restricted cash from the private equity funding into our ACM Shanghai subsidiary.*"

\*\*\*

**Outlook**

*For fiscal year 2020, the Company expects revenue to be in the range of $130 million to $150 million*, unchanged from its January 13, 2020 announcement.

\*\*\*

**Revenue**. ***Revenue for 2019 was $107.5 million***, up 44% from 2018, due primarily to an increase in revenue from single-wafer wet cleaning tools. ***Revenue for the fourth quarter of 2019 was $24.6 million***, up 18% from the fourth quarter of 2018, due to an increased volume of tools shipped for revenue and higher prices associated with those tools.

83.    The statements referenced in ¶82 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (vi) the Company's expected revenues were inflated due to its reliance on related party transactions; (v) the Company inflated its cash position; (vi) accordingly, the Company's internal controls and procedures were not effective; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

84.    On March 19, 2020, ACM hosted an earnings call with investors and analysts to discuss the Company's fourth quarter 2019 results (the "Q4 2019 Earnings Call").  During the scripted portion of the Q4 Earnings Call, Defendant Wang stated, in relevant part, "[o]ur full year 2020 outlook is unchanged. ***We expect revenue to be in the range of $130 million to $150 million as we announced on January 13. This represents 30% annual growth at the midpoint***[,]" and "[a]s [indiscernible] we

23

are committed to our [indiscernible] balance between current profits and investment growth. *We believe that growing fast with the profitability will deliver the maximum value to our shareholders*." Further, also during the scripted portion of the call, Defendant McKechnie stated, in relevant part, "*Q4 was another strong quarter ending 2019 at a high note with good profitability[,] and "[r]evenue was $107.5, up 44%*."

85.     The statements referenced in ¶85 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) The Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) The Company's expected revenue was contradicted by internally-known, present facts; (vi) Defendants' growth plans will not deliver maximum benefits to U.S. investors, who will not be able to access any profits that could come from the Shanghai subsidiary, where 98% of ACMR's business takes place (vii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (viii) as a result, the Company's public statements were materially false and misleading at all relevant times.

86.     On March 24, 2020, ACM filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K").  The 2019 10-K contained a substantively similar overview of the Company, its customers, and its sales and marketing as referenced in ¶44, *supra*.

87.     The 2019 10-K stated that "*[r]evenue for 2019* compared to 2018 *increased by $32.9 million*. *The increase was due to a $22.4 million increase in revenue from single-wafer wet cleaning*

**tools to our front-end customers, and an $10.5 million increase in revenue of tools to our back-end customers**[,]" and "[c]ost of revenue increased $16.7 million, and **gross profit increased $16.2 million**, for 2019 compared to 2018, reflecting the growth in sales."

88.     The 2019 10-K further stated that the Company's "cash, cash equivalents and restricted cash at end of period" was $117,859,000.

89.     The statements referenced in ¶¶87-88 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the Company's cash position was overstated by over $27 million;  (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

90.     In addition, with respect to disclosure controls and procedures, the 2019 10-K stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

…

**Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2019, our company's disclosure controls and procedures were effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure**.

**Management's Report on Internal Control Over Financial Reporting**

….

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2019.***

91.     Appended as an exhibit to the 2019 10-K was substantively the same SOX certification as referenced in ¶59, *supra*, signed by Defendants Wang and McKechnie.

92.     The statements referenced in ¶¶91-92 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (vi) the Company's expected revenues were inflated due to its reliance on related party transactions; (v) the Company inflated its cash position; (vi) accordingly, the Company's internal controls and procedures were not effective; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

93.     On May 6, 2020, ACM issued a press release announcing the Company's first quarter 2020 results.  The press release stated, in relevant part:

**Outlook**

For fiscal year 2020, the Company continues to expect revenue to be in the range of $130 million to $150 million.

*** *

- **Revenue** was ***$24.3 million, up 18.9%,*** reflecting an increase in revenue from single wafer wet cleaning and other front-end processing equipment, offset in part by a decrease in revenue from back-end wafer assembly and packaging equipment.

94.     The statements referenced in ¶93 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made

false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

95.     On May 7, 2020, ACM hosted an earnings call with investors and analysts to discuss the Company's first quarter 2020 results (the "Q1 2020 Earnings Call").  During the scripted portion of the Q1 2020 Earnings Call, Defendant Wang stated, in relevant part, "[w]e delivered double-digit revenue growth, even though some shipments delayed from Q1 into Q2," and "[w]e expect revenue to be in the range of $130 million to $150 million. This will represent 30% annual growth at the mid-point."

96.     Also during the scripted portion of the Q1 2020 Earnings Call, Defendant McKechnie stated, in relevant part, "[f]or the first quarter, revenue was $24.3 million, up 19%. Q1 revenue and shipments were impacted by the COVID-19 related shutdowns. Revenue growth was driven by an increase in front-end equipment …."

97.     The statements referenced in ¶¶95-96 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) the Company's Q1 revenue was impacted not only by COVID-19, but by (iii) customer advances were likely greater than what the Company reported; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant

times. collateralizing the loans with CEO's personal guarantees as opposed to the company's fixed assets

98.     On May 8, 2020, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "Q1 2020 10-Q"). The Q1 2020 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*. Further, the Q1 2020 10-Q stated, in relevant part:

> **The increase in revenue of $3.8 million** in the three months ended March 31, 2020 as compared to the same period in 2019 reflected increases in revenue of $10.0 million from front-end single-wafer cleaning equipment, offset in part by a decrease in revenue of $6.1 million from back-end wafer assembly and packaging equipment.
>
> ***
>
> Cost of revenue increased $2.5 million and **gross profit increased $1.4 million** in the three months ended March 31, 2020, as compared to the corresponding period in 2019, due to increased sales volume and lower gross margin.

99.     The statements referenced in ¶98 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

100.     Finally, with respect to controls and procedures, the Q1 2020 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

28

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2020. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission, or the SEC. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of March 31, 2020, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.

101.    Appended as an exhibit to the Q1 2020 10-Q was substantively the same SOX certification as referenced in ¶59, *supra*, signed by Defendants Wang and McKechnie.

102.    The statements referenced in ¶¶100-101 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (vi) the Company inflated its cash position; (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

103.    On August 5, 2020, ACM issued a press release announcing the Company's second quarter 2020 results.  The press release stated, in relevant part:

29

**Outlook**

For fiscal year 2020, the Company now expects revenue to be in the range of $140 million to $155 million, up from the previous guidance range of $130 million to $150 million.

\*\*\*

- **Revenue** *was $39.0 million, up 34.6%,* reflecting an increase in revenue from single wafer wet cleaning and other front-end processing equipment, and an increase in revenue from back-end wafer assembly and packaging equipment.

104.    The statements referenced in ¶103 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

105.    On August 6, 2020, ACM hosted an earnings call with investors and analysts to discuss the Company's second quarter 2020 results (the "Q2 2020 Earnings Call").  During the scripted portion of the Q2 2020 Earnings Call, Defendant Wang stated, in relevant part:

*We delivered revenue of $39 million, up 35% year-over-*year.

\*\*\*

Accordingly, we have updated our full year 2020 outlook. *We expect revenue to be between $140 million and $155 million, upper from the previous range of $130 million* to $150 million. The revised revenue range represents 37% annual growth at mid-point.

106.    Further, also during the scripted portion of the Q2 2020 Earnings Call, Defendant McKechnie stated, in relevant part, "[f]or the second quarter, revenue was $39 million, up 35%. Growth was driven by solid demand for our front-end equipment and back-end tools …."

107.    The statements referenced in ¶¶105-106 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) for the same reason, the Company's expected revenue was also inflated; (iv) customer advances were likely greater than what the Company reported; (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

108.    On August 10, 2020, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 20, 2020 (the "Q2 2020 10-Q").  The Q2 2020 10-Q touted a substantively similar overview of the Company as referenced in ¶44, *supra*.  Further, the Q2 2020 10-Q stated, in relevant part:

> ***The increase in revenue of $10.0 million in the three months ended June 30,*** 2020 as compared to the same period in 2019 consisted of ***an increase in revenue of $8.9 million*** from single-wafer cleaning and other front-end processing equipment and an increase in revenue of $1.1 million from back-end wafer assembly and packaging equipment and spares.

109.    The Q2 2020 10-Q also stated that the Company had $90 million in cash, cash equivalents and restricted cash at the end of the reporting period.

110.    The statements referenced in ¶¶108-109 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts

31

about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the Company was likely short of cash, as evidenced by the Company's borrowing at high rates of interest and by its collateralization of the aforementioned loans with Defendant Wang's personal guarantees as opposed to ACM's fixed assets (v) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

111.    Finally, with respect to controls and procedures, the Q2 2020 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

….

***Based on the evaluation of our disclosure controls and procedures as of June 30, 2020, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective***.

112.    Appended as an exhibit to the Q2 2020 10-Q was substantively the same SOX certification as referenced in ¶59, *supra*, signed by Defendants Wang and McKechnie.

113.    The statements referenced in ¶¶111-112 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iv) accordingly, the Company's internal controls and procedures were not effective;

and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

114.   On August 13, 2020, ACM presented at the Needham Virtual SemiCap and EDA Conference, where Defendant Wang stated as follows:

> The company was founded in U.S. 1998 and 2005 made a joint venture in the China and 2017 we got there our IPO in NASDAQ. ***And also last year we're starting a planning our subsidiary in Shanghai go to the Star Market in China***. So our goal probably keeping both lists ACM headquarter or mother company in NASDAQ and also our subsidiary industry in China.
>
> ***Our goal is really more of expanding penetrate the local China market as same time with not in a structure also maintain good sales and marketing and on the force to penetrate the market outside China. So our goal we believe eventually our half revenue come from China and half revenue come from outside of China market.*** And I think that's our strategy.

115.   The statements referenced in ¶114 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) The STAR company and ACMR US have adopted rules to keep ACMR US from "making use of the issuer's funds"; (ii) U.S. investors will not be able to access any profits that could come from the Shanghai subsidiary, where 98% of ACMR's business takes place; (iii) the foregoing, once revealed, would foreseeably subject the Company to significant financial and/or reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

116.   On September 30, 2020, ACM reported that the application for the STAR IPO was approved by the Listing Committee of the STAR Market.

117.   On October 1, 2020, just before the truth about the Company began to emerge, ACM announced the approval of the proposed STAR listing of ACM Shanghai.

118.   The statements referenced in ¶117 were materially false and misleading because

Defendants made false and/or misleading statements, as well as omitted that the STAR company and ACMR US adopted rules to keep ACMR US from making use of the issuer's funds, thereby definitively denying US investors any gains from the referenced subsidiary.

119.    As of October 7, 2021, ACM is still not listed on the STAR Market.

120.    In the wake of the scrutiny brought to bear on ACM following the publication of the J Capital report and update, the planned STAR IPO has stalled.   The Company reiterated the crucial nature of the STAR listing:

> If we are unable to complete the STAR Listing and the STAR IPO, we may not otherwise be able to realize the advantages to our PRC operations contemplated by our business strategy, ***including improving our ability to market our products, building our brand in the PRC markets, assisting our sales efforts to new customers and encouraging additional purchases of our tools by existing customers***.

### **The Truth Begins to Emerge**

121.    On October 8, 2020, analyst J Capital published a report (the "report") concerning ACM entitled "Dirty Business," in which J Capital concluded that ACM "is a fraud, over-reporting both revenue and profit." J Capital asserted that "[w]hat real profit the company has is apparently being siphoned off to related parties."

122.     J Capital co-founder and research director Anne Stevenson-Yang does has spent the bulk of her professional life in China since first arriving in 1985, working as a journalist, magazine publisher, and software executive, with stints in between heading up the U.S. Information Technology office and the China operations of the U.S.-China Business Council.

123.    Over the years, J Capital has exposed numerous frauds including Luckin Coffee and Fanhua, Inc.

124.    The J Capital report was based on (i) their in-person visits to ACMR sites in China, Korea, and California; (ii) credit reports on ACMR subsidiaries accessed by J Capital; (iii) J Capital's

review of ACMR's exchanges with Shanghai regulators; and (iv) more than 40 interviews conducted by J Capital.

125.    The initial J Capital report disclosed, in relevant part:

A.      There is a large mismatch between what clients have told [J Capital] and what ACMR reports. *ACMR claims nearly $20 mln in inventory of delivered machines—meaning completed machines that have not been paid for and are sitting on customer premises. This is an astonishing 45% of total inventory*…. There is no room for inventory of completed goods. [J Capital] believes that the $19.6 mln in finished-goods inventory reported by the company is an invention.

B.      [J Capital] ha[s] evidence that undisclosed related parties are diverting revenue and profit from the company.

C.      Cash is missing in the STAR IPO company accounts vs the U.S. GAAP accounts.

D.      ACMR appears to be strapped for cash in spite of the $86 mln reported on the balance sheet. ACMR had $25.77 mln in shortterm borrowings in Q2 2020, up by $21.88 mln QoQ and at average annualized borrowing cost of 6.1% compared with annualized interest income of 1.3%. ACMR's CEO has personally guaranteed 11 of 13 short-term "lines of credit" issued on the mainland.

126.    Independent corroboration exists for each of the above claims made in the J Capital report.

A.      **ACM's Inventory-Related Advances Skyrocketed Following the J Capital Report**

127.    With respect to inventory, J Capital's initial report noted that:

Advances from customers were $8.42 mln at end 2018 when full year revenue was $74.64 mln. By end Q2 2020, advances from customers were $8.78 mln, yet annualized Q2 2020 revenue was $156.2 mln (4 x $39.05 mln). Revenue has basically doubled, while advances from customers have stayed flat. Customer deposits should at least match the momentum in business activity.[2]

128.    J Capital's finding that ACM's advances from customers were out of sync with revenue is corroborated by the fact that, in the wake of J Capital's disclosures to the investing public, ACM's 1)

---

[2] 2020_10_07_acmr_1.pdf (jcapitalresearch.com) at 14-15.

advances from customers – which refers to payments received for goods or services that have not been delivered yet – and 2) revenue, changed dramatically:

### Figure 1: Advances from Customers (Q2 2020 to Q2 2021)

| Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 |
|---------|---------|---------|---------|---------|
| $8.8 m | $8.0 m | $17.9 m | $32.7 m | $43.8 m |

### Figure 2: Revenue (Q2 2020 to Q2 2021)

| Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 |
|---------|---------|---------|---------|---------|
| $39 m | $47.7 m | $45.6 m | $43.7 m | $53.9 m |

### Figure 3: Advances from Customers as a Percentage of Revenue (Q2 2020 to Q2 2021)

| Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 |
|---------|---------|---------|---------|---------|
| 22% | 16.7% | 39.2% | 74.8% | 81.2% |

129.    ACM has never explained the dramatic jump in customer advances following the publication of the J Capital reports.  The most plausible explanation for its sudden shift is that upon revelation by J Capital of this misconduct, the Company modified its customer advance practices.

130.    As shown in Figure 3 above, following the issuance of J Capital's reports in the Fourth Quarter of 2020, ACM's reported advances from customers more than doubled as a percentage of revenue. This supports J Capital's conclusion that the Company failed to disclose the true amount of customer advances.

**B.    ACM Failed to Disclose Related Party Transactions**

131.    During the Class Period, ACM failed to disclose that nearly all of its sales are run through designated "agents," or that at least three of the five agents who comprise ACM's top clients are related parties.

132.    The J Capital report also discussed certain related party transactions, *i.e.*, that the five of the "agents" responsible for 91% ACMR's sales are likely shell companies to divert money due to the following:

- According to interviews with procurement managers at the largest customers, none of the interviewees had heard of the agents that ACMR claims to have.

- At least three of these agents are related parties whose relationship has not been disclosed to U.S. investors.

133.    The report explained, in relevant part:

We think ACMR management is using five on-paper-only companies to divert money. In September, we learned more about this process. ***We obtained ACMR's responses to questions from Chinese regulators about its IPO application, and in those documents, ACMR discloses that almost all its sales run through "agents."***

\*\*\*

We have gotten detailed pricing and invoicing information from six of ACMR's top clients. Five of them had paid more for equipment than ACMR disclosed. We think that extra payment was diverted, possibly to management via an "agent" or possibly back to the SOE customer."

134.    In particular, the report cited specific related parties whose relationships had not been disclosed to U.S. investors.  For example, the J Capital report stated, in relevant part:

Lida is responsible for 41% of ACMR 2019 sales and is owned by an undisclosed related party. The ¥15.26 mln commission that ACMR reported paying to Lida in 2019 represented 45% of Lida's income. These facts are disclosed to the Chinese regulator in response to questions about the draft registration document. But the English-language 8K fails to mention these things.

135.    Lida owner Wang Beiyi is also a supplier to ACMR, owner of an agency selling on behalf of ACMR, and a shareholder of both the Chinese IPO vehicle and U.S.-traded company. ACMR owns 15% the company that Wang uses to sell "filters etc." to ACMR. ACMR makes the ridiculous claim that Wang's company, Shengyi Semiconductor Technology (Wuxi) Co., Ltd., sells them filters— a commodity product that is abundant in China—for 62% less than competitors.

136.    At the time of the report (October 2020) despite Lida being a significant related party, the information was not disclosed to US investors. Instead, the earliest disclosure to US investors of the relationship/ownership of Lida and ACMR dates to December 15th, 2020.

137.    Similarly, states the J Capital report, "[i]n its registration statement [for ACM Shanghai], ACMR reported one set of payments to "customers" and another to "final customers." Yangtze Memory and Huahong were both customers and end (or final) customers, *i.e.*, were collecting hefty commissions on selling to themselves:

### Sales to top [f]ive customers (2018)

| SN | Name | Amount | Proportion |
|---|---|---|---|
| | **2018** | | |
| 1 | Huahong Group | 12,667.23 | 23.02% |
| 2 | Yangtze Memory | 12,653.88 | 23.00% |
| 3 | Hynix | 12,117.32 | 22.02% |
| 4 | Qianjing International | 6,935.04 | 12.60% |
| 5 | ACMR | 6,081.94 | 11.05% |
| | Total | 50,455.41 | 91.69% |

### Sales to top 5 final customers (2018)

| SN | Name | Amount | Proportion |
|---|---|---|---|
| | **2018** | | |
| 1 | Yangtze Memory | 18,735.81 | 34.05% |
| 2 | Huahong Group | 15,314.19 | 27.83% |
| 3 | Hynix | 12,117.32 | 22.02% |
| 4 | JCET | 2,536.22 | 4.61% |
| 5 | SMIC | 2,188.16 | 3.98% |
| | Total | 50,891.71 | 92.49% |

Source: 8K pages 135-136

138.    Although ACM concealed the role of agents to U.S. investors, it admitted those facts (in Chinese) to Shanghai regulators, conceding that "[a]*gents play a significant role in market development activities of the Issuer"*.[3] And while ACM stated that it is common practice that agents are used in the semiconductor industry,[4] the Company failed to address the key question why none of the three procurement managers interviewed had heard of the agents that ACM claims to have. It beggars belief that procurement managers had not heard of the agents despite the agents being the first line of contact.

---

[3]  https://www.sec.gov/Archives/edgar/data/0001680062/000114036120028466/brhc10017901_ex99-01.htm at 8-4-1-22

### C.   Cash is missing in the STAR IPO company accounts vs U.S. GAAP accounts

139.    As discussed in the J Capital reports, ACM has made different disclosures to U.S. investors and Chinese regulators.

140.    ACM's revenue diverted to related parties was highlighted in the J Capital report demonstrating the gap between the Company's STAR IPO account and U.S. GAAP account:

#### Table 5. Current Assets US GAAP vs Chinese IPO Accounts

| US GAAP accounts (,000 US dollars) | 2019 | 2018 | 2017 |
| --- | --- | --- | --- |
| Cash and cash equivalents | $58,261 | $27,124 | $17,681 |
| Restricted cash* | $59,598 | - | |
| Other current assets | $0 | $0 | $46 |
| Total cash and equivalents | $117,859 | $96,028 | $62,914 |
| STAR IPO Accounts (,000 USD equivalent) | | | |
| Cash and bank balances | $62,861 | $13,690 | $6,450 |
| Other current assets | $27,510 | $531 | $141 |
| Total cash and equivalents | $90,371 | $81,119 | $41,380 |
| Difference | -$27,488 | -$14,909 | -$21,534 |

141.    While ACM countered to U.S. investors that J Capital incorrectly referenced the amount of "total current assets" in the consolidated financial statement for 2017 and 2018 as the "total cash and equivalents", an apples-to-apples comparison of the cash line item between claims the Company made to U.S. investors in SEC filings, and the more candid disclosures it made to Chinese regulators in connection with the planned STAR IPO, is even more stark than the one identified by J Capital:

| In USD '000 | 2019 | 2018 | 2017 |
| --- | --- | --- | --- |
| ACMR U.S. filings | | | |
| Cash and cash equivalents | 58,261 | 27,124 | 17,681 |
| Restricted cash* | 59,598 | - | - |
| Total Cash and equivalents | 117,859 | 27,124 | 17,681 |
| STAR IPO Disclosure to | | | |

---

[4] *Id.*

| Chinese regulators | | | |
|---|---|---|---|
| Cash and cash equivalents | 90,371 | 14,221 | 6,592 |
| Restricted cash* | 0 | 0 | 0 |
| Total Cash and equivalents | 90,371 | 14,221 | 6,592 |
| Difference | (27,488) | (12,903) | (11,089) |
| Difference % | -23% | -48% | -63% |

142.    Despite ACM's protests, the J Capital report was supported by links to original documents, including Chinese language documents, that supported its allegations, *see* https://www.jcapitalresearch.com/acmr.html, as well as photos and videos of site visits to ACM-related facilities, *see* https://www.jcapitalresearch.com/acmr-site-visits.html

143.    At midday on October 8, 2020, ACM issued a press release claiming that "[t]he [J Capital] report contains numerous misstatements of historical facts regarding ACM's business and operations, including, among others, errors regarding revenue, tool ASPs, gross margins, key suppliers, inventory, and other balance sheet-related items." However, unlike J Capital, the Company did not offer any evidentiary support for its claims. ACM promised that those details would be revealed during the Company's upcoming earnings call set for November 2020.

144.    ACM's threadbare denials failed to dispel investors' well-founded pessimism, and the Company's stock price fell $1.09 per share, or 1.52%, to close at $70.79 per share on October 8, 2020.

145.    Despite the October 8, 2020 price drop, ACM did not substantively respond to the J Capital report during its Q3 2020 earnings call, held on November 6, 2020. Instead, Defendant Wang repeated the Company's previous, boilerplate denials and told analysts that ACM would refute the J Capital revelations in a "comprehensive report" to be released publicly.

146.    On November 5, 2020, ACM issued a press release announcing the Company's third quarter 2020 results.  The press release stated, in relevant part:

ACM's President and Chief Executive Officer Dr. David Wang commented, "***We delivered strong third quarter results with 43% growth in revenue*** and 37% growth in shipments from the third quarter of 2019. Both revenue and shipments in are new quarterly records for ACM. We built momentum for Tahoe with another repeat shipment, and for ECP with two repeat shipments and one first tool delivery in the third quarter. We have good visibility for the remainder of 2020 and have raised our outlook accordingly."

147.    The statements referenced in ¶146 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had materially overstated its revenues and profits; (ii) the Company's revenue and profits had been diverted to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; (iv) 12.5% of equipment delivered since 2009 and 45% of total inventory has not been paid for; (v) the Company's expected revenue was contradicted by internally-known, present facts; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

148.    On November 9, 2020, ACM filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q"). The Q3 2020 10-Q touted a substantively similar overview of the Company as referenced in ¶45, *supra*. Further, the Q3 2020 10-Q stated, in relevant part:

> ***The increase in revenue of $28.1 million*** in the nine months ended September 30, 2020 as compared to the same period in 2019 reflected increases in revenue of $28.9 million from single-wafer cleaning and other front-end processing equipment, offset by a decrease in revenue of $0.8 million from back-end wafer assembly and packaging equipment and spares.
>
> ***
>
> Cost of revenue increased $16.4 million and ***gross profit increased $11.7 million*** in the nine months ended September 30, 2020, as compared to the corresponding period in 2019, due to increased sales volume and higher gross margin.

149.    The statements referenced in ¶148 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) the Company inflated its gross profit margin by burying production costs in the R&D budget; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

150.    Finally, with respect to controls and procedures, the Q3 2020 10-Q stated, in relevant part:

**Disclosure Controls and Procedures**

….

***Based on the evaluation of our disclosure controls and procedures as of September 30, 2020, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures over financial reporting were effective.***

151.    Appended as an exhibit to the Q3 2020 10-Q was substantively the same SOX certification as referenced in ¶59, *supra*, signed by Defendants Wang and Feng.

152.    The statements referenced in ¶¶150-151 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated its revenues and profits; (ii) the Company's revenue and profits were inflated by sales to undisclosed related parties; (iii) customer advances were likely greater than what the Company reported; (iv) the Company's cash position was overstated; (iv) in fact, the Company was likely short on cash, as evidenced by the Company's borrowing at high rates of interest and by its collateralization of the

aforementioned loans with Defendant Wang's personal guarantees as opposed to ACM's fixed assets (v) accordingly, the Company's internal controls and procedures were not effective; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

### D.   The J Capital Update Confirms That ACM is Short on Cash

153.   On November 17, 2020, J Capital issued an update (the "update") to its original report regarding ACM, explaining that "[w]e posed a number of questions for ACM Research (ACMR) before its Q3 results, but the quarter report just deepened the mystery." The November 17, 2020 J Capital report queried "why ACMR seems so cash-starved when the company reported a cash balance of $92.2 mln in Q3 2020 and a positive operating cash flow. Nevertheless, the company took on new debt specifically to fund short-term working capital. Q3 2020 short-term debt rose from $25.8 mln in Q2 2020 to $28.3 mln."

154.   Moreover, the November 17 update flagged the following "[u]nexplained discrepancies related to interest earned on cash balances":

- Interest income earned during Q3 2020 was just $179,000 com-pared to end-period cash balances of $92.2 [million], a dramatic fall relative to the $320,000 in interest earned in the previous quarter, when end-period cash balances were lower, at $86.4 [million].

- In Q3 2020, the company incurred an interest expense of $272,000, far higher than any interest earned.

155.   The November 17 update also shed light on the discrepancy between ACM's "15 different lines of credit, 14 from mainland China banks, of which 10 bear personal guarantees by CEO David Wang" and the fact that "[n]o debt is collateralized or guaranteed by the company's assets on Mainland China, where the principal operations are located."

156.    ACM's reliance on credit thus drew into question the allegedly "real and unencumbered" nature of the Company's assets, which it should have used against primarily Mainland Chinese debt obligations.

157.    Likewise, the update homed in on ACM's Q3 2020 admission that the Company had delivered fifteen (15) single-wafer wet cleaning and other front-end processing machines, but that these same machines *had yet to be paid for by the receiving customer(s)*. As noted in the update, these inchoate sales existed in a sort of limbo: there were tax receipts or cash transactions for auditors to verify, because no sale had been booked.

158.    In addition, the update report discussed ACM's reliance on "gold leasing," an esoteric form of credit commonly used by miners and jewelers but not industrial companies.  As explained by a Chinese banker cited in the update, "[i]f you make semiconductor cleaning equipment, the gold you secure for leasing becomes your inventory. It's really a trading security, but no one can tell it apart from other inventory. It does not show up as debt. It's purely a way to fatten the balance sheet." The gold leasing provision cast doubt on whether ACMR actually had –or could access – the $92.2 million it claimed to have in cash at the time of the update.

159.    Building upon the October 8 report, J Capital's November 17 update identified fresh, material disclosures by the Company to Shanghai-based regulators in Chinese ***but not to U.S. investors in English***. Specifically, J Capital reported that Chinese language filings made to Chinese regulators disclosed that, STAR Company and ACMR US had adopted rules to keep ACMR US from "making use of the issuer's funds." By contrast, to U.S. investors, it only said that such ace,ss was uncertain, not that it was definitively blocked by corporate rules.  This was crucial given that ***98% of ACM's profits*** came ***from the Shanghai subsidiary***.

160.    During the quarters ending June 30, 2020, September 30, 2020, December 31, 2020, ACM represented that it had between $71.8 million and $92.2 million in cash:

*Figure 4: Cash on Hand (Q2-Q4 2020)*

| Q2 2020 | Q3 2020 | Q4 2020 |
|---------|---------|---------|
| $86.4 m | $92.2 m | $71.8 m |

161.    At the same time, ACMR had between $25.8 million and $28.3 million in interest-bearing short-term borrowings during respective quarters, with interest expense between $0.2 million and $0.4 million – these figures reflect lines of credit:

*Figure 5: Interest-Bearing Short-Term Borrowings (Q2-Q4 2020)*

| Period   | Q2 2020 | Q3 2020 | Q4 2020 |
|----------|---------|---------|---------|
| *Amount* | $25.8 m | $28.3 m | $26.1 m |
| *Interest* | $0.2 m | $0.3 m | $0.4 m |

162.    Despite the cash on hand and other corporate collateral, J Capital reported ACMR's CEO has personally guaranteed 11 of 13 short-term "lines of credit" issued on the Chinese mainland, a fact that ACM has never bothered to refute.

163.    ACM has never explained why a personal guarantee was necessary to collateralize these loans, which is highly unusual for a company of ACM's size, where loans are typically collateralized with the Company's own assets.  That lenders familiar with ACM's Chinese operations required such extreme measures for even short-term loans amounting to a fraction of claimed cash on hand corroborates that the cash balances reported to U.S. investors were unreliable and inflated.

164.    Following the publication of J Capital's update, ACM's stock price fell again, this time by $4.03 per share, or 5%, to close at $77.79 per share on November 17, 2020.

165.    As a result of Defendants' wrongful acts and omissions, and the decline in the price of ACM securities detailed herein, Plaintiff and other Class members have suffered significant losses and damages.

166.     The investor research site *Seeking Alpha* observed that the influence of the J Capital on investors was undeniable because "market participants were explicitly shorting the stock" and "the fact remains that short interest in ACMR has risen in 2020 compared to the year before."[5]

167.     On December 15, 2020, ACM filed with the SEC on Form 8-K an alleged English translation of a document purportedly submitted to the Shanghai Stock Exchange. In the rambling, 116-page document, ACM claimed to have "conducted self-inspection on the relevant challenges" identified by the J Capital report. However, the Company failed to rebut the allegations herein:

> A. In response to the mismatch between customer advances and revenue, ACM played up minor differences between various subsidiaries' billing policies, as well and also claimed that customer advances were "comparatively low because its customers are well-known companies in the semiconductor industry that have strong business reputations and are in continuous and normal cooperation with the Company." Defendants' explanations do not explain the company-wide discrepancy, amount to an admission that billing policies were essentially *ad hoc*, and or do not explain the massive jump in customer advances following publication of the J Capital report and update.[6]

> B. Defendants' claims regarding the ubiquity of agents in the industry does not serve to excuse or even explain Defendants' non-disclosure of related parties to U.S. investors.[7]

> C. Nowhere did Defendants adequately explain why they made different disclosures to U.S. and Chinese investors respectively.

## ADDITIONAL SCIENTER ALLEGATIONS

168.     As alleged herein, ACM and the Individual Defendants acted with scienter in that: (i) they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii)

---

[5]   https://seekingalpha.com/article/4393551-rising-risks-for-acm-research-even-though-continues-to-grow-rapidly

[6]   https://www.sec.gov/Archives/edgar/data/0001680062/000114036120028466/brhc10017901_ex99-01.htm at 8-4-1-62 to 8-4-1-65.

[7] *See id.* at 8-4-1-22.

they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ACM, their control over and/or receipt and/or modification of ACM's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning ACM, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

169.  ACM's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. § 78u-5(b)(2)(A).

170.  Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of ACM who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

171.    At all relevant times, the market for ACM securities was an efficient market for the following reasons, among others:

(a)    ACM stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    According to the Company's Form 10-K for the fiscal year ended December 31, 2019, ACM had more than 16 million shares of Class A common stock and more than 1 million shares of Class B common stock outstanding as of March 17, 2020;

(c)    as a regulated issuer, ACM filed periodic public reports with the SEC;

(d)    ACM regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)    unexpected material news about ACM was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

172.    As a result of the foregoing, the market for ACM securities promptly digested current information regarding ACM from publicly available sources and reflected such information in the price of ACM securities.  Under these circumstances, all purchasers of ACM securities during the Class Period suffered similar injury through their purchases of ACM securities at artificially inflated prices, and a presumption of reliance applies.

173.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding ACM's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts

withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

174.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ACM securities and operated as a fraud or deceit on Class Period purchasers of ACM securities by misrepresenting the value of the Company's business and prospects by concealing the significant defects in its underwriting and due diligence practices and deficiencies in its commercial credit portfolio and related securitized assets.   As the Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's securities fell precipitously as the prior artificial inflation came out of the securities' price.   As a result of their purchases of ACM securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

175.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired ACM securities during the Class Period (the "Class").   Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

176.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ACM securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through

49

appropriate discovery, Plaintiff believes that are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ACM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

177.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

178.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

179.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of ACM; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

180.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

181.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

182.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of ACM securities during the Class Period.

184.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ACM securities.  Plaintiff and the Class would not have purchased ACM securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against All Defendants)**

185.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

186.    Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Company stock, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.   The Company controlled the Individual

1  Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to

2  Section 20(a) of the Exchange Act.

3  ## PRAYER FOR RELIEF

4  WHEREFORE, Plaintiff prays for relief and judgment, as follows:

5  A.    Determining that this action is a proper class action, designating Plaintiff as Lead

6  Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

7  Procedure and Plaintiff's counsel as Lead Counsel;

8  B.    Awarding compensatory damages in favor of Plaintiff and the other Class members

9  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

10  wrongdoing, in an amount to be proven at trial, including interest thereon;

11  C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

12  action, including counsel fees and expert fees; and

13  D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

14  ## JURY TRIAL DEMANDED

15  Plaintiff demands a trial by jury.

16  DATED:  October 7, 2021                          Respectfully submitted,

17  **POMERANTZ LLP**

18  */s/ Louis C. Ludwig*
   Patrick V. Dahlstrom
   (*pro hac vice*)
   Louis C. Ludwig
   (*pro hac vice*)
   10 South La Salle Street, Suite 3505
   Chicago, Illinois 60603
   Telephone: (312) 377-1181
   Facsimile: (312) 377-1184
   pdahlstrom@pomlaw.com
   lcludwig@pomlaw.com

   **POMERANTZ LLP**
   Jennifer Pafiti (SBN 282790)

1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice*)
J. Alexander Hood II
(*pro hac vice*)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

*Lead Counsel*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff*