# EXHIBIT N

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY KAIN, Individually and on Behalf of All Others Similarly Situated,<br><br>                            Plaintiff,<br><br>        *v.*<br><br>ACM RESEARCH, INC., DAVID HUI WANG, LISA FENG, and MARK A. MCKECHNIE,<br><br>                            Defendants. | Case No: 3:20-cv-09241-VC<br><br>**CLASS ACTION**<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT<br><br>Date: July 8December 2, 2021<br>Time: 12:00 p.m.<br>Location: Courtroom 4 - 17th Floor<br>Judge: Hon. Vince Chhabria |

## TABLE OF CONTENTS

**Page**

I.      Introduction ……………………………………………………………………….. 1

II.     Statement of Facts ……………………………………………………… 4

    A.      Factual Background …………………………………………………… 4

    B.      The J Capital Reports ………………………………………………... 4

III.    Argument …………………………………………………………………… 7

    A. Legal Standard ………………………………………………………… 7

    B. The Complaint Adequately Pleads Falsity …………………………………… 8

    C. The Complaint Adequately Pleads Scienter ………………………………... 10

        1.   Legal Standard ………………………………………………………… 10

        2.   Defendants Made Specific Statements Related to
           ACM's Core Operations …………………………………………… 11

        3.   The Complaint Adequately Alleges Motive …………………………… 12

    D. The Complaint Adequately Pleads Loss Causation ………………………… 12

    E. The Complaint Adequately Pleads Control Person Liability ………………...
    1514

IV.     Conclusion ………………………………………………………………………...
    1514

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1' Cir. 2002)……………………………………………………… 12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009))…………………………………………………….. 7

*Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008))……………………………………………… 8,11

*Camp v. Qualcomm Inc.,*
    2020 U.S. Dist. LEXIS 42079 (S.D. Cal. Mar. 10, 2020) ……………………… 14

*City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.,*
    468 F. Supp. 3d 1048 (E.D. Wis. 2020) ……………………………………… 5

*Diaz v. Northern Dynasty Minerals, Ltd.,*
    17-CV-1241 PSG, 2018 WL 5099749 (C.D. Cal. Apr. 30, 2018) ……………… 9

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) …………………………………………………… 13, 14

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ……………………………………………… 15

*Elliot v. China Green Agrics., Inc.,*
    No. 3:10-CV-0648-LRH-WGC, 2012 U.S. Dist. LEXIS 157572
    (D. Nev. Nov. 1, 2012) ……………………………………………………… 5

*Eng v. Edison Int'l,*
    2018 U.S. Dist. LEXIS 43629 (S.D. Cal. Mar.16, 2018) ……………………… 14

*Erica P. John Fund, Inc. v Halliburton Co.,*
    563 U.S. 804 (2011) …………………………………………………… 13, 14

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995) ……………………………………………… 8

*Grigsby v. Boil Holding, Inc.,*
    979 F.3d 1198 (9th Cir. 2020) ……………………………………………… 15

*Hagan v. Khoja,*
139 S. Ct. 2615 (2019) …………………………………………………… 10

~~*Harris v. Am Trust Fin. Servs.,*~~
~~135 F. Supp. 3d 155 (S.D.N.Y. 2015) …………………………………………9~~

*Howard v. Everex Systems, Inc.,*
228 F.3d 1057 (9th Cir. 2000) ………………………………………… ~~12~~11

*In re Banc of Cal. Sec. Litig.,*
No. SACV 17-00118 AG (DFMx), 2017 WL 3972456
(C.D. Cal. Sept. 6, 2017) …………………………………………….. 9

*In re Cell Therapeutics, Inc. Class Action Litig.,*
No. 2:10-cv-00414-MJP, 2011 WL 444676 (W.D. Wash. Feb. 4, 2011) ……… 14,15

*In re China Educ. Alliance Inc., Sec. Litig.,*
2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ………………………………….. 9

*In re Gilead Scis. Sec. Litig.,*
536 F.3d 1049 (9th Cir. 2008) ………………………………………… 13, 14

*In re Twitter Inc. Sec. Litig.,*
326 F.R.D. 619 (N.D. Cal. 2018) …………………………………………… 14

*In re Verifone Holdings Inc. Sec. Litig.,*
704 F.3d 694 (9th Cir. 2012) ………………………………………….. 10, 11

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.,*
2021 U.S. App. LEXIS 14892 (9th Cir. May 19, 2021) ……………………… 13

*Khoja v. Orexigen Therapeutics, Inc.,*
899 F.3d 988 (9th Cir. 2018) ……………………………………… 7, 9, 10, 14

*Maiman v. Talbott,*
No. SACV090012AGANX, 2009 WL10675075 (C.D. Cal. Sept. 14, 2009) …... 14

*Matrixx Initiatives, Inc. v. Siracusano,*
563 U.S. 48 …………………………………………………………… 12

*Miao v. Fanhua, Inc.,*
442 F. Supp. 3d 774 (S.D.N.Y. 2020) ………………………………………… 5

*Miller v. Thane Ina, Inc.,*
519 F.3d 879 (9th Cir. 2008) ………………………………………….. 10

*Mineworkers' Pension Scheme v. First Solar Inc.,*
    881 F.3d 750 (9th Cir. 2018) …………………………………………………….. 13

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) …………………………………………………….. 14

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.,*
    774 F.3d 598 (9th Cir. 2014) …………………………………………………….. 12

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) ……………………………………………… 3, 11

*Rok v. Identiv, Inc.,*
    *2017 U.S. Dist. LEXIS 1019 (N.D. Cal. Jan. 4, 2017) ……………………………… 8*

*Snellink v. Gulf Resources, Inc.,*
    870 F. Supp. 2d 930 (C.D. Cal. 2012) ………………………………………….. 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) …………………………………………………… 7, 10, 12

*Yanek v. Staar Surgical Co.,*
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ………………………………………… 7

**Rules**

Fed. R. Civ. P. 9(b) …………………………………………………………… 7, 8, 12

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

Lead Plaintiff Jeffrey Kain ("Plaintiff") respectfully submits this memorandum in opposition to Defendants' motion to dismiss the Amended Class Action Complaint ("Complaint") (ECF No. 4963) and states the following:[1]

I.     **INTRODUCTION**

In dismissing the prior complaint, this Court provided Plaintiff the opportunity to improve upon it. Plaintiff has done so, and has streamlined the allegations to include only those for which he could provide additional, investigatory support. In particular, the Complaint cogently pleads that:

- ACM's inventory-related advances skyrocketed following the J Capital Report;

- ACM failed to disclose related party transactions;[2]

- Cash is missing from the STAR IPO company accounts versus ACM"s U.S. GAAP accounts;

- The J Capital Update confirmed that ACM is short on cash.

After finding itself short on cash – despite claiming to have nearly $90 million on hand – ACM has both borrowed at high rates of interest, and pushed for the initial public offering of its Shanghai subsidiary in order to raise the funds it lacks. At all relevant times, ACM Research, Inc. ("ACM" or "the Company") was (i) dependent upon access to the U.S. for critically-needed parts and investment capital and (ii) traded in the U.S. on the NASDAQ. Accordingly, Defendants were motivated to mislead ACM's U.S. shareholders, who were targeted to fund the operations of ACM's Shanghai subsidiary, with little if any upside to the U.S. shareholders themselves.

---

[1] Defendants are ACM and its senior officers and directors David Hui Wang ("Wang"), Lisa Feng, and Mark A. McKechnie. References to "¶_" are to the Complaint. References to "D.Br." are to Defendants' Notice of Motion and Motion to Dismiss (ECF No. 50). Emphasis is added throughout, unless otherwise noted.

[2] Defendants' claim that Plaintiff must plead that "related party" existed pursuant to Item 404 of Regulation S-K is irrelevant where the Complaint is silent as to Item 404.

To that end, Defendants, throughoutThroughout the Class Period, [23] Defendants made materially false and misleading statements regarding ACM's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's revenue and profits had been diverted to undisclosed related parties; (ii) accordingly, the Company had materially overstated its revenues and profits; and (iii) as a result, the Company's public statements were materially false and misleading.

On October 8, 2020 and November 17, 2020, stock-research analyst J Capital Research ("J Capital"), which is helmed by a well-known expert on Chinese companies, published reports and subsequent update concerning ACM, in which J Capital concluded that ACM "is a fraud, over-reporting both revenue and profit." The report cited, among other things, J Capital's own visits to sites in China, Korea, and California and more than 40 interviews as the basis of its well-researched and well-supported findings that:

- ACM's revenue could be overstated by as much as 15-20%.

- ACM is building tools but has virtually no capital equipment. The value of office equipment added since the start of 2019 greatly exceeds the value of added manufacturing equipment.

- undisclosed related parties are diverting revenue and profit from the Company. This includes ACM suppliers making sales for the Company and customers allowed to collect commissions on sales to themselves.

- inventory levels were suspiciously high, with 45% of total inventory has not been paid for and are sitting on customer premises.

- a material level of sales to undisclosed related parties;

- cash is missing in ACM's Shanghai subsidiary IPO company accounts versus its U.S. GAAP accounts;

- ACM tunnels over-reported profit out of the Company which may be through about $20 million in overstated inventory costs and through cash that is inflated or just compromised.

- At least $11 million in warranty and service expenses are understated.

---

[23] Defined in the Complaint as March 6, 2019 through November 16, 2020, inclusive. ¶67.

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

- ACM appears to be strappedACM's actions showed a need for cash in spite ofinconsistent with the $86 million cash it reported on the balance sheet.

ACM had $25.77 million in short-term borrowings in Q2 2020, up by $21.88 million quarter-over-quarter. ACM's CEO has personally guaranteed 11 of 13 short-term "lines of credit" issued on the Chinese mainland.;

- Cash is missing in the Shanghai subsidiary IPO company accounts vs the U.S. GAAP accounts.

- Inventory levels appeared unusually high.

- ACM's assumption of debt was inconsistent with its stated cash position.;

- ACM's financials were rife with unexplained discrepancies related to interest earned on cash balances, a well-known red flag.

- ACM's reliance on 15 lines of credit did not comport with its alleged possession of unencumbered assets in Mainland China, where its debt obligations were also located.; and

- American investors will be unable to access any profits that could come from ACM'sACMR's Shanghai subsidiary, where 98% of the Company's business takes place. ¶12-14.

As alleged, the J Capital reports did not simply make these charges, but linked to source documents that "supported its allegations." ¶124. Despite every opportunity — and their claimed ability — to do so, Defendants did not and could not rebut the J Capital allegations or the source documents cited. When the truth became known to the market, the price of ACM common stock reacted accordingly. Between October 8, 2020 and November 17, 2020, as Defendants' misrepresentations were revealed to the market, or that the risks they had concealed materialized, ACM's stock price fell by $1.09 and $4.03 per share, respectively. While Defendants now attempt to discredit the J Capital reports, they cannot dispute that the charges were deemed sufficiently plausible by market participants to stall ACM's STAR listing.

PlaintiffPlaintiffs adequately allegesallege falsity by setting out with particularity all the false and misleading statements, including the reasons why each was false. ¶¶40-112, 128-13440-117, 146-152. That J Capital was a short-seller does not render Defendants' statements truthful, and none of the authorities Defendants' cite support such

9

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

a rule. At this stage, the Complaint's allegations that Defendants furthered an impression of a state of affairs that differed in a material way from the one that actually existed during the Class Period are enough to move this case into discovery.

On scienter, the Complaint pleads that Defendants recklessly made specific public statements concerning ACM's core operations, knowledge of which may be imputed to them. This is all that is required at the motion to dismiss stage. *See Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014). Nowhere do Defendants dispute that knowledge of the Company's core operations can be imputed to them pursuant to the core operations doctrine, which is the law in this Circuit. Moreover, Defendants fail to proffer any competing, non-culpable inference in response to Plaintiff'sPlaintiffs' cogently-pled allegations.

Finally, because the Complaint alleges that the disclosure or materialization of the risk of Defendants' false statements caused Plaintiff's – and the Class's —losses, the Complaint adequately pleads a claim for loss causation under the Securities Exchange Act of 1934. Defendants ask the Court not to consider the undeniable nexus between their conduct and Class's losses, but rather to arbitrarily and erroneously compare those losses to other trading days.rely on a restrictive reading of case law that the Ninth Circuit has specifically disavowed at length to find that the Complaint does not adequately allege loss causation.

Accordingly, the motion to dismiss should be denied.

## II.     STATEMENT OF FACTS

### A.     Factual Background

ACM develops, manufactures, and sells single-wafer wet cleaning equipment for integrated chips, which it markets and sells its products through direct sales force and third-party representatives. ¶¶2628, 2729. Though ACM is an American company, and had its U.S. initial public offering ("IPO") in 2017, the Company's sole US operations – "ACM Research (CA)" – during the Class Period consisted of 5 employees occupying a 3,000 square foot office and warehouse space in Fremont, California. The function of this

entity is to provide procurement services on behalf of ACM's Shanghai subsidiary. ¶28. ACM expanded its operations into Asia in 2006 and formed the subsidiary, ACM Research (Shanghai), Inc. ("ACM Shanghai"), which occupied a central role for the Company during the Class Period. ¶¶32-3334-35.

Substantially all the Company's product development, manufacturing, support and services are in Mainland China. Twenty-eight of the company's 361 full-time employees are located in Korea, and the rest are in China and Taiwan. ¶2931. All the company's sales in 2018, 2019, and 2020 were made to customers outside the United States. *Id.* ACM's heavy reliance on the Asia-Pacific region for growth is underscored by just three customers in China accounting for 73.8% of the Company's revenue in 2019. ¶3133. Two customers based in China (PRC) accounted for 54% of the revenue, Korea-based SK Hynix accounted for 19.8%. *Id.* Cementing its Asia-centric focus, ACM Shanghai, in May 2020, submitted its application for an initial public offering (IPO) of its shares on the Shanghai Stock Exchange STAR Market ("Star Market"). If successful, the Company will be the first US-traded company to list a China-based subsidiary on the STAR market. ¶3638. On September 30, 2020, ACM reported that its application for the STAR IPO was approved by the Listing Committee of the STAR Market. ¶37116.

B.    The J Capital reports

On October 8, 2020, J Capital published a report (the "J-Cap Report") concerning ACM entitled "Dirty Business," in which it concluded that ACM "is a fraud, over-reporting both revenue and profit." J Capital asserted that "[w]hat real profit the company has is apparently being siphoned off to related parties." ¶113121. J Capital co-founder and research director Anne Stevenson-Yang has spent the bulk of her professional life in China since first arriving in 1985, working as a journalist, magazine publisher, and software executive, with stints in between heading up the U.S. Information Technology office and the China operations of the U.S.-China Business Council. ¶114122. Over the years, J Capital has exposed numerous frauds including Luckin Coffee and Fanhua, Inc.[34]

---

[34] Defendants baselessly attack J Capital, citing court decisions that did not involve J Capital at all, see D.Br. 86-7, or a few instances where other counsel in other actions

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

¶115123. The J-Cap Report was based on (i) J Capital's in-person visits to ACM sites in China, Korea, and California; (ii) credit reports on ACM subsidiaries accessed by J Capital; (iii) J Capital's review of ACM's exchanges with Shanghai regulators; and (iv) more than 40 interviews conducted by J Capital, ¶116124, including "a half dozen production workers at ACMR's Shanghai plant, with more than a dozen suppliers, and with customers."

Defendants misrepresent the facts alleged and the investigation involved in their claim to be unable to find "particularized facts showing that J Capital's opinions are credible" or that they found no evidence of "independent investigation" by counsel. (D.Br. 7-8). As alleged, counsel reviewed the photographic and documentary evidence appended to the J Capital reports and determined that they "supported" J Capital's charges. *See* ¶124142. Counsel also conducted further investigation which included, among other things, "a review of ... analyst reports about the Company." Complaint at 1. Moreover, as part of that investigation, counsel spoke directly with the author of the J Capital reports, Anne Stevenson-Yang, and confirmed the factual bases of the report. See Declaration of Louis C. Ludwig, submitted herewith.

The report reviewed evidence and concluded that ACM's margins and revenue were overstated, among other irregularities, including documentation that ACM's "non-final" customers were earning commission selling to themselves. ¶122. Also important was the comparison of ACM's diverted and/or disappeared revenue highlighted in the J-Cap Report and demonstrating the gap between the Company's STAR IPO account and U.S. GAAP account. ¶123140.[45]

_____

involving *other companies* miscited J Capital-generated reports, *see* D.Br. 76 (citing *City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*, 468 F. Supp. 3d 1048, 1058 (E.D. Wis. 2020) and *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803 (S.D.N.Y. 2020)). *But see Elliot v. China Green Agrics., Inc.*, No. 3:10-CV-0648-LRH-WGC, 2012 U.S. Dist. LEXIS 157572, at *11 (D. Nev. Nov. 1, 2012) (rejecting request to strike "internally investigated" J Capital report).

[45] Based on this inclusion alone, Defendants are wrong to argue that Plaintiff did not substantiate his claim that ACM's financials were overstated. D.Br.10 9. And while Defendants attempt to create an improper factual dispute here by asserting that "[i]t is

At midday on October 8, 2020, ACM issued a press release claiming, with no factual support, that the J-Cap Report was inaccurate. ¶125143. ACM's empty denials failed to dispel investor pessimism, and the Company's stock price fell $1.09 per share, or 1.52%, to close at $70.79 per share on October 8, 2020. ¶126164.

Despite the October 8, 2020 price drop, ACM did not substantively address the J Capital report during its Q3 2020 earnings call, held on November 6, 2020. Instead, Defendant Wang repeated the Company's previous boilerplate denials and told analysts that ACM would refute the J Capital revelations in a "comprehensive report" to be released publicly. ¶127145.

On November 17, 2020, J Capital issued a second report which updated to its original report regarding ACM ("the J-Cap Update"), in which it flagged the glaring discrepancy between ACM's interest income and interest expense. ¶136154. The J-Cap Update also shed light on the discrepancy between ACM's "15 different lines of credit, 14 from mainland China banks, of which 10 bear personal guarantees by CEO David Wang" and the fact that "[n]o debt is collateralized or guaranteed by the company's assets on Mainland China, where the principal operations are located." ¶137155. ACM's heavy and inexplicable reliance on credit thus drew into question the allegedly "real and unencumbered" nature of the Company's assets, which it inexplicably failed to use against primarily Mainland Chinese debt obligations. ¶138156. The J-Cap Update also revealed or clarified, among other things, that:

- the sale of 15 single-wafer wet cleaning and other machines had not been finalized;

- ACM entered into extensive related-party transactions, including with a major supplier; and

- U.S. investors would be barred from accessing ACM Shanghai's profits. [¶¶139-140157-159.]

---

unsurprising that ACMR,ACMR, as the parent company, would have more cash on its balance sheet than one of its severalreports the cash of the Chinese subsidiary *plus* the cash of its other subsidiaries and in its own accounts." (D.Br. 118), they fail to address the fact that ACM Shanghai and ACM Wuxi (the Company's other Chinese subsidiary) accounted for 96% of ACM's total main operating income during the Class Period. ¶33.

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

Following the publication of the J-Cap Update, ACM's stock price fell again, this time by $4.03 per share, or 5%, to close at $77.79 per share on November 17, 2020. ¶143. On December 15, 2020, Defendants reassured Shanghai regulators that the Company had "conducted self-inspection on the relevant challenges" in the J Capital reports, ¶146157, yet failed to contest most of the allegations leveled against the Company, as they had vowed to do previously.

III.    **ARGUMENT**

A.    **Legal Standard**

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), draws all reasonable inferences in plaintiffsPlaintiffs' favor, *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1120 (C.D. Cal. 2005), and upholds the Complaint if it plausibly states a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiffPlaintiffs adequately plead violations of Section 10(b) by alleging that a defendant: (1) made a misstatement or omission of material fact ("falsity"), (2) with scienter. (3) which caused the plaintiff's losses. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). This is accomplished by identifying the "who, what, when, where, and how" as noted under Fed. R. Civ. P. 9(b) and specifying "[1] each statement alleged to have been misleading, [2] the reason or reasons why the statement is misleading, and, [3] if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." *Id.* "Whether a public statement is misleading . . . is a mixed question to be decided by the trier of fact" that may be resolved on a motion to dismiss "only if the adequacy of the disclosure" [] is 'so obvious that reasonable mind could not differ.'" *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

B.    **The Complaint Adequately Pleads Falsity**

A statement giving a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists" is misleading and actionable. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). The Complaint

adequately pleads that Defendants issued false and misleading statements regarding, *inter alia*, ACM's:

- Strength of financial results, revenue, internal controls, and accessibility Strength of financial results, ¶¶40, 41, 53, 76.

- Revenue, ¶¶40-42, 49, 53, 55-58, 67, 69, 76, 79, 92, 101, 103-104, 106, 128, 130.

- Profitability and cash flow from operations, ¶¶41, 53, 55.

- Gross margin, ¶¶42, 49, 96, 103.

- Demand-driven growth, ¶¶42, 55, 63, 65, 67, 74, 76.

- Revenue recognition, ¶¶44-45, 47, 58, 69.

- Internal controls, ¶¶51, 60-61, 71-72, 80-81, 89-90, 98-99, 108-109, 132-133.[5]

Accessibility of Chinese profits, ¶111.

Defendants falsely argue that the Complaint relies "solelyexclusively" on the J Capital reports. D.Br.75. In so arguing, Defendants conveniently ignore the 1000+ page mountain of Chinese language documents J Capital released in conjunction with the reports, which counsel reviewed. *See* ¶124. Defendants also disregard market sentiment, which, as the investor blog *Seeking Alpha* noted following the end of the Class Period, had shifted toward shorting ACM in the wake of the J Capital revelations. ¶145166.

Defendants' attempt to recast J Capital consecutive revelations of the truth as "short-seller attacks" (*see* D.Br. 7) likewise rings hollow. Even accepting, *arguendo*, Defendants' characterization of the J Capital disclosures as "short-seller" reports, courts have held that such reports *can* suffice to establish falsity when the facts are publicly available and verifiable, as they are here. *See In re Banc of Cal. Sec. Litig.,* No. SACV 17-00118 AG (DFMx), 2017 WL 3972456, at *10 (C.D. Cal. Sept. 6, 2017); *Snellink v.*

---

[5] Defendants' reliance on *Rok v. Identiv, Inc.*, 2017 U.S. Dist. LEXIS 1019, at *18 (N.D. Cal. Jan. 4, 2017) is misplaced. That case only held that plaintiffs may not *assume* weaknesses, but the Complaint here sets forth extensive, detailed examples of widespread deficiencies in Defendants' financial reporting.

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

*Gulf Resources, Inc.*, 870 F. Supp. 2d 930, 938 (C.D. Cal. 2012).[6] The report makes clear that, "[t]o the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable . . . ." *See* ECF No. 51-3 at 1. Moreover, as the *Banc of California* court noted, "the Court isn't willing to close the courthouse to any investor who was defrauded simply because the fraud was revealed by a short-seller." *Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *10.[7] Indeed, this Court also rejected Defendants' premise that short-seller reports are categorically barred from underlying an Exchange Act claim. ECF No. 62:1-7.

Defendants argue that certain of the alleged misrepresentations were disclosed during the Class Period. They were not. Defendants' statement that "[u]nder existing [Chinese] laws and regulations, it may be difficult, if not impossible, for [ACMACMR] to be able to receive dividends comprised of funds generated by ACM Shanghai[.]" was inaccurate because American investors absolutely could not receivereceived dividends).

---

[6] Notwithstanding Defendants' false claim that the J-Cap reports constituted "opinions" because they used some non-ironclad language, D.Br. 9At the very least, the truth of reportsshort-seller report authored by an analyst firm constitutes a factual dispute that is not ripe for resolution on pleadings. *See In re China Educ. Alliance Inc., Sec. Litig.*, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011). That Defendants themselves seek to introduce extraneous analyst reports for the purpose of factually challenging certain allegations, see D.Br.3, further confirms that the disputes at issue are factual and must be resolved on a full record. As the Ninth Circuit unambiguously explained, "***it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well pleaded complaint.***" *Orexigen.*, 899 F.3d at 1003.

[7] By contrast, Defendants' reliance on *Diaz v. Northern Dynasty Minerals, Ltd.*, 17-CV-1241 PSG, 2018 WL 5099749 (C.D. Cal. Apr. 30, 2018) is inapposite. D.Br. 7. There, the district court held that reliance on confidential sources *within* a short-seller report were not sufficient to allege falsity. Here, the J Capital reports do not purport to rely on confidential witnesses, but, rather, stand on their own documentary evidence. In *Harris v. AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015), the problem, again, was not reliance on a short seller report *per se*, but rather the inaccuracy of *the particular report at issue.*

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

D.Br. 13 n.4; ECF No. 51-11. The Ninth Circuit has held that "[e]ven if a statement is not false, it may be misleading if it omits material information." *Orexigen*, 899 F.3d at 1008–09, *cert den. sub nom., Hagan v. Khoja*, 139 S. Ct. 2615 (2019); *see also*. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (even statements that may be literally true, statementsnonetheless can be misleading and actionable under the federal securities laws due to their context and manner of presentation.). Defendants' claim to have disclosed their reliance on 15 lines of credit likewise fails, both because the credit lines were presented without any context as individuated line items in a 91-page SEC filing and because the filing in question was not submitted until 1 week prior to the end of the Class Period. D.Br. 13; ECF No. 51-10.[87]

### C.    The Complaint Adequately Pleads Scienter

#### 1.    Legal Standard

Complaints adequately plead scienter where, as here, they support a culpable inference of scienter at least as compelling as any non-culpable inference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). A strong inference "need not be irrefutable, i.e., of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (internal citations omitted). Rather than scrutinizing each allegation in isolation, courts are required to analyze scienter allegations holistically. *Id.* at 326. "[A]n extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it" suffices. *In re Verifone Holdings Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (internal quotation marks and citations omitted). The Complaint easily meets this standard.

---

[87] Defendants claim' contention that they disclosed the truth to investors through a generic statement that some, unspecified figures in ACM's Chinese filings might be different from U.S. filings is illustrative. D.Br. 11; ECF No. 51-8. Like Defendants' other supposed disclosures, any context is completely lacking.

### 2. Defendants Made Specific Statements Related to ACM's Core Operations

As documented in the J Capital reports, the Company's fraud involved ACM Shanghai, a core operation. For example, ACM Shanghai IPO documents, which were not issued to American investors, revealed that the subsidiary had negative operating cash flow for 2019, hugely significant because the area in which ACM Shanghai operated -- the Chinese Mainland - accounted for 96% of ACM's total main operating income. ¶¶32-3333. "[I]t is hard to believe that [Defendantsdefendant] would not have known" about financial difficulties affecting theirits most significant operations. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008).

That Defendants knew about ACM Shanghai's deficiencies is shown not only by the economic significance of that subsidiary, but also because Defendants held themselves out to investors as having knowledge of the topics. As alleged, Defendants held themselves out as authorities to both analysts and Chinese regulators in response to specific questions about these critical sectors and the same financials shown to be false in the J Capital reports. ¶¶41-42, 51-52, 54-55, 146.

As the Ninth Circuit has explained, where defendants make misleadingly incomplete or false misstatements about matters about which they claim knowledge, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese*, 747 F.3d at 572. This is unquestionably the case here.

Defendants' lengthy statements cited in the Complaint, brimming with details regarding ACM's financials, without disclosure that the figures in question were inadequate, created an obvious risk of misleading investors. Accordingly, the Complaint's allegations give rise to a strong inference of scienter.

### 3. The Complaint Adequately Alleges Motive

Though not required, motive is relevant to a Section 10(b) claim. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 48. A defendant's motive to make false statements to preserve a company's very existence is relevant under the PSLRA. *See*

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

*Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (executives' recognition of inadequate cash flow and need for additional funding created potential for motivation to inflate sales and otherwise misrepresent financials, supporting scienter); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)) (scienter supported by corporate officers' understanding that rollout of new product was "important to their own survival and that of the company.").

By ACM's own admission, the success of its subsidiary IPO is of existential importance to the Company. ¶¶4, 39120 (citing Defendants' warning to shareholders that "[i]f we are unable to complete the STAR Listing and the STAR IPO, we may not otherwise be able to realize the advantages to our PRC operations contemplated by our business strategy, ***including improving our ability to market our products, building our brand in the PRC markets, assisting our sales efforts to new customers and encouraging additional purchases of our tools by existing customers***."). Defendants were, at all relevant times, motivated to present a positive image of the Company to American investors. Accordingly, Defendants had ample motive – ACM's very existence – to recklessly or knowingly make the material misstatements and omissions alleged in the Complaint.[98]

### D. The Complaint Adequately Pleads Loss Causation[109]

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To allege loss causation, a plaintiff need only "demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Where "the complaint alleges facts that, if taken as true, plausibly establish loss causation . . .

---

[98] Not only does the Complaint establish a strong inference of scienter at least as compelling as any non-culpable inference, *see Tellabs*, 551 U.S. at 326, ***Defendants have failed to proffer any competing inference at all***.

[109] While Fed. R. Civ. P. 9(b) applies to pleading loss causation, *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014), the Ninth Circuit has yet to define the parameters of review on a motion to dismiss.

dismissal is inappropriate." *Gilead*, 536 F.3d at 1057. Therefore, "it is normally inappropriate to rule on loss causation at the pleading stage." *Id.* The Ninth Circuit has clarified that a corrective disclosure need not reveal that a fraud occurred; rather, it **suffices to reveal facts that the fraud had concealed.** *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018).[11]

Each of the Complaint's corrective disclosures supports loss causation. The October 8, 2020 corrective disclosure (the J-Cap Report) revealed 1) over-reporting revenues and margins, 2) capital equipment required to build tools, 3) overstated inventory costs, 4) understated warranty and service costs, 5) ACM's cash position, and 6) undisclosed individuals diverting revenue and profit from the Company. ¶¶9-11, 113-124. LikewiseMeanwhile, the November 17, 2020 corrective disclosure (the J-Cap Update) revealed inconsistencies and discrepancies related to 1) debt assumption figures, 2) interest earned on cash balances, 3) reliance on credit, and 4) finished goods inventory. ¶¶13, 135-142. As explained above, see pp. 3, 6-7, the revelation of Defendants' misrepresentations, or the materialization of the risk that was not disclosed, caused investors to suffer quantifiablesubstantial losses. Thus, each of the corrective disclosures meets the Ninth Circuit's loss causation standard.[12]

---

[11] Defendants' citations to *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2021 U.S. App. LEXIS 14892 (9th Cir. May 19, 2021) are misplaced here. *See* D.Br. 13. *Uber* did not involve an Exchange Act claim at all, but instead one brought under California Corporations Code sections 25400(d) and 25500, with the Exchange Act functioning as mere "persuasive authority."

[12] Defendants' suggestion that the timing of Plaintiff's purchases bars loss causation at the pleading stage (D.Br. 14 n.5) confuses the concepts of loss causation and damages. "Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812, (2011). Indeed, Defendants' assertion is premature even at the class certification stage, let alone at the pleading stage. *See, e.g.*, *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 625 (N.D. Cal. 2018) ("in-and-out traders are appropriately included in the class definition"); *Maiman v. Talbott*, No. SACV090012AGANX, 2009 WL10675075, at *3 (C.D. Cal. Sept. 14, 2009) ("the fact that two of the Funds Plaintiffs sold their shares during the class period does not mean they are incapable of proving loss causation").Finally, Plaintiff's addition of a corrective

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

Defendants erroneously cite to a single district courtDistrict Court decision, *Eng v. Edison Int'l*, 2018 U.S. Dist. LEXIS 43629, at *6-7 (S.D. Cal. Mar.16, 2018) for the proposition that a stock-drop must be "statistically significant."[13] D.Br. 13-1414. Leaving aside that neither Ninth Circuit nor Supreme Court precedent requires statistical significance as a prerequisite to pleading loss causation, the *Eng and Qualcomm courtscourt* erred in going outside the respective complaints'complaint's four corners to undermine and contradict the plaintiffs' respective allegations. *See Orexigen*, 899 F.3d at 1006 ("improper" for courts to venture "beyond testing the sufficiency of the claims and into the realm of factual disputes"); *see also Gilead*, 536 F.3d at 1057 (same). In addition, those courts impermissibly elevated defendants' version of events over plaintiffs'. *See No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (criticizing failure "to accept Plaintiffs' allegations as true").

Similarly, Defendants' reference to alternative facts based on extraneous documents and dates not cited in the Complaint do not undermine Plaintiff's challenge loss causation allegations. D.Br. 1414-15. As discussed above, *Orexigen* forbids such practices. Moreover, a loss causation inquiry focuses on the trading day after the alleged correction, and not on subsequent fluctuations in price that any number of factors might cause. *See In re Cell Therapeutics, Inc. Class Action Litig.*, No. 2:10-cv-00414-MJP, 2011 WL 444676 *6 (W.D. Wash. Feb. 4, 2011).[14]

---

disclosure in his Complaint is unrelated to the circumstances surrounding the Court's determination to appoint him as Lead Plaintiff. D.Br. 14 n.5.

[13] Defendants' reliance on the unpublished decision in *Camp v. Qualcomm Inc.*, 2020 U.S. Dist. LEXIS 42079, at *19 (S.D. Cal. Mar. 10, 2020) is equally misplaced. That case merely repeats *Eng* regarding statistical significance and asserts that "double-digit" loss allegations are common. But *Dura* requires neither — only that a complaint allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.*; 544 U.S. at 338.

[14] Plaintiff's loss causation allegations are not affected by the recent decision in *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1208-09 (9th Cir. 2020), which focused on an investor report that was both anonymous and sourced entirely from publicly-available information. This is not the case here.

### E.    The Complaint Adequately Pleads Control Person Liability

Defendants argue only that the Complaint's Section 20(a) claim is inadequate for its failure to plead a primary violation of Section 10(b). D.Br. 1415. Because Plaintiff has adequately pleaded an underlying violation, the Court should hold that the Complaint adequately pleads a Section 20(a) violation.

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' motion in its entirety.[15]

DATED: June 10November 4, 2021        Respectfully submitted,

**POMERANTZ LLP**
*/s/ Louis C. Ludwig*

_____
Patrick V. Dahlstrom
(*pro hac vice*)
Louis C. Ludwig
(*pro hac vice*)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

**POMERANTZ LLP**

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190

_____

[15] If the Court dismisses the case, it should grant leave to further to amend the Complaint. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Contrary to Defendants' disingenuous suggestion that Plaintiff has been the lead plaintiff in this action for more than 6 months, Plaintiff was, in fact, not appointed to his current role until April 16, 2021, following a contested lead plaintiff contest. *See* ECF No. 36. Thus, Plaintiff has controlled this litigation for less than two months.

Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss SAC - Case No. 3:20-cv-09241-VC

jpafiti@pomlaw.com

**POMERANTZ** LLP
Jeremy A. Lieberman
(*pro hac vice*)
Alexander Hood II
(*pro hac vice*)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

*Lead Counsel*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff*